UNITED STATES of America,
Appellant,

v.

Bobby Eugene ALLISON, James William Spires, James Lonnie Greer, Marvin L. Robinson, Appellees.

No. 79–1816.

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 18, 1980.

Decided March 12, 1980.

Rehearing and Rehearing En Banc
Denied April 28, 1980.

Samuel A. Perroni, Sp. Asst. U.S. Atty., Little Rock, Ark., for appellant; George W. Proctor, U.S. Atty., Sandra W. Cherry, Asst. U.S. Atty., Little Rock, Ark., on the brief.

William R. Wilson, Jr., Little Rock, Ark., and John F. Forster, Jr., Wallace, Hilburn, Clayton, May & Calhoon, North Little Rock, Ark., for appellee; Jack T. Lassiter, McArthur & Lassiter and James L. Sloan, Little Rock, Ark., on the brief.

Before GIBSON, Senior Circuit Judge, and ROSS and HENLEY, Circuit Judges.

ROSS, Circuit Judge.

The United States appeals from the decision of the district court [1] to suppress evidence which was objected to on fourth amendment grounds by defendants/appellees Bobby Eugene Allison, James William Spires, James Lonnie Greer and Marvin L. Robinson. The evidence in question consists of records of the Laborers International Union of North America, Local 1282, which were obtained by agents of the Federal Bureau of Investigation pursuant to a grand jury subpoena duces tecum. The district court held that the agents' search and seizure of the records after presentment of a subpoena duces tecum, without informing the union officials of their legal rights regarding a subpoena duces tecum, constituted both a misuse of the writ and a violation of the fourth amendment's prohibition against unreasonable searches and seizures. The district court also found that the subpoena duces tecum had been improperly served and that the consent given for the agent's search was therefore invalid. Finally, the court implicitly ruled that each of the defendants had "standing" to challenge the admission of records into evidence on fourth amendment grounds.

---

1. The Honorable G. THOMAS EISELE, Chief Judge, United States District Court for the Eastern District of Arkansas, presiding.

The defendants were indicted by a federal grand jury in Arkansas on October 2, 1978, for conspiracy, racketeering in violation of 18 U.S.C. § 1962(c) and (d), subornation of perjury and making false declarations to a grand jury in violation of 18 U.S.C. §§ 1622 and 1623, and embezzlement of union funds in violation of 29 U.S.C. § 501(c). The trial began on May 29, 1979, and three days later, through an oral motion, the defendants moved to suppress the admission into evidence of all union records which were obtained after the service of the subpoena duces tecum. A suppression hearing was held on May 31 and June 1, 1979. The motion was then denied. On June 5, a mistrial was declared on grounds wholly unrelated to the issues before us here.

While a retrial of the case was pending, a second suppression hearing was held. On August 17, 1979, the testimony of an F.B.I. agent raised several questions relating to the trial court's factual findings in the first suppression hearing. The court then adjourned until some of the original witnesses could be brought back in for further questioning.

On August 29, a third hearing was convened, at the close of which the district court reversed its previous holding and granted the defendants' motion to suppress the records. The government thereafter suggested that the records were essential to the prosecution of its case, and the court agreed that an appeal directly from the evidentiary ruling would be appropriate.

On appeal, pursuant to 18 U.S.C. § 3731, the government takes exception only to the district court's conclusions of law. Therefore, that court's factual findings provide the background for our review of this matter.

The issues before us arose out of an investigation of Local 1282 which was conducted by F.B.I. special agent Danny D. Sisco. In November 1977 Sisco was informed of the activities of certain officials of the local, including some of the defendants in this appeal, and he had read newspaper accounts of possible embezzlement and misappropriation of the local's funds.

In order to further investigate, the agent requested the issuance of a grand jury subpoena duces tecum for the production of certain records of the local. The district court noted that the problems before us would never have arisen if a search warrant had been issued. The court also noted, however, that there was some question as to whether a proper showing for a warrant could be made.

Agent Sisco was aware that a state subpoena for portions of the local's records had previously been issued and was never complied with. A fire, which occurred within 24 hours of the service of the state's subpoena, destroyed some of the records. Great care was therefore taken by the agents to assure that the service of the grand jury subpoena duces tecum did not bring about an attempt to destroy the records. The agents planned to remain at the union headquarters until all of the records were secured. Several knockdown cardboard boxes were taken to the union headquarters along with a roll of evidence tape. In addition, Mr. Perroni, an Assistant United States Attorney, advised agent Sisco to gain permission to assist in the assembling of the records and, once assembled, to volunteer to transport the records to the Federal Building.

The subpoena was addressed to Mr. Allison, who was mistakenly believed to be the custodian of the records. It directed Mr. Allison to appear before the grand jury at 9:30 a. m. on February 10, 1978, and to bring with him certain records and documents from the union's files. The agents arrived at the union headquarters at some time shortly after 8 o'clock a. m. on February 10, and were informed that Mr. Allison was not there. They were shown instead to Mr. Greer's office, who was Secretary-Treasurer of the local, and the actual custodian of the records. The subpoena duces tecum was served on Greer.

Although a reading of the transcripts in this case raises several questions as to what happened next, it is clear that there is sufficient evidence in the record to support the district court's factual determination that

Greer had consented to the search. The district court found that Agent Sisco presented Greer with a subpoena duces tecum for the records, stating that they were there to get them, to which Greer responded, "Fine. We do not have anything to hide." Additionally, the district court found:

> Although I do not think it is pertinent here, the Court has stated before and he is convinced, although it's speculative to a certain extent, that had Mr. Greer been thoroughly advised of all his rights, he nevertheless would have consented. He was in a consenting frame of mind and a cooperative frame of mind. That's quite clear.

The facts which bear out the trial court's conclusion are numerous. There was initially some uncertainty, for example, as to whether Greer could gather all of the records together. The F.B.I. agents were, however, eager to render their aid, so Greer led them to the records room. Greer subsequently helped the agents in identifying the pertinent documents and records, and arranged for a light and a portable heater to be placed in the room. He initialed the evidence tape on all of the boxes of records which had been gathered, and acquiesced when the agents offered to transport the boxes to the United States Attorney's office. At one point in the gathering and boxing of the records, Greer even had coffee served to the government agents. The inescapable conclusion from this review of the facts is that the district court correctly held that Greer consented to the search.

It also appears from the record that Mr. Greer consented to the actual seizure of the union's records. The district court found that:

> Mr. Sisco advised Mr. Greer if the latter wanted the agents to, they, the agents, would haul the records down to the Federal Building; and Mr. Greer readily accepted their offer.

There are, however, two questions which controlled the district court's decision to suppress the evidence. The first is whether the wielding of a subpoena duces tecum was a false assertion of legal authority to conduct the search which negated the *voluntariness* of Greer's consent. The second is whether, in light of the fact that the subpoena duces tecum was addressed to Allison, Greer *could* give legal consent to the search conducted pursuant to the writ. In holding that there was no legal consent to the agents' search, the district court focused on both of these issues.

The first basis for the district court's holding is that the exhibiting of the subpoena duces tecum in obtaining Greer's consent negated the voluntariness of his consent and cooperation. Such a procedure raised questions, in the mind of the trial court, of possible abuses of the power of a grand jury. Moreover, the court specifically found that neither Allison[2] nor Greer knew the actual legal effect of a subpoena duces tecum or their right to object to a search by the officers serving it. Therefore the earlier conclusion that there was no illegal search was withdrawn, and the court held that, "as a matter of law, whatever acquiescence, cooperation, or consent were, in fact, given by Mr. Greer or Mr. Allison, it was insufficient to meet the legal standards that obtain in situations like this."

The court then set out to define the legal standards which obtain in situations such as this. The standards which pertain to the normal consent search situation were rejected in favor of more stringent ones: "When a subpoena duces tecum is used this way, the Court concludes that the agents had no alternative but to advise Mr. Greer of his legal rights or otherwise to show that he was aware of those rights before they could rely on any consent thereafter given." The standard suggested by the court is thus one of proving "knowing and informed consent."

---

**2.** During the process of sorting the records, Mr. Allison appeared at the union office. Greer showed Allison the subpoena. Allison read it

but did not stay at the offices for longer than ten minutes. While there, Allison advised the agents that Greer was in charge of the records.

The second basis for the court's holding is that there was no valid consent in this case because it was not obtained from the person named in the subpoena. Thus, the court points out, even if its theory of legal consent is incorrect, there was still no valid consent in this case because of the flaw in the service of the subpoena duces tecum. The improper service of the writ to Greer, rather than to Allison, precluded any chance of obtaining legal consent.

The government takes the position that the standards applicable to the normal consent search situation are applicable here. And they contend that the flaw in the service of the subpoena did not affect the legal consent which was obtained from Greer. We agree with the government's conclusions, and reverse the district court's decision. However, our analysis follows a slightly different course.

Before turning to our discussion of the issues of legal consent and the improper service of the subpoena duces tecum, however, there is one additional matter which merits our attention on appeal. The district court held that each of the four appellees had "standing" to assert the protection of the exclusionary rule.

## I.

We first address the question of which of the four appellees is entitled to claim the protection of the fourth amendment by objecting to the use at trial of the evidence obtained from the union. Since the standing of all of the appellees was held to be "implicit" in the trial court's suppression ruling, the question is properly before us on appeal.

This issue has, until recently, been couched in terms of whether or not a defendant has "standing" to object to the introduction of certain evidence at trial on fourth amendment grounds. *See, e. g., Alderman v. United States*, 394 U.S. 165, 171–76, 89 S.Ct. 961, 965–68, 22 L.Ed.2d 176 (1969); *Mancusi v. DeForte*, 392 U.S. 364, 367–70, 88 S.Ct. 2120, 2123–25, 20 L.Ed.2d 1154 (1968). Such an analytical approach, however, was subsequently found by the Supreme Court to give credence to theories of standing which were inconsistent with the Court's view of the nature of fourth amendment rights. Consequently, in *Rakas v. Illinois*, 439 U.S. 128, 139, 99 S.Ct. 421, 428, 58 L.Ed.2d 387 (1978), where the Court had occasion to examine the logical underpinnings of the exclusionary rule and its relationship to the theory of standing, it held that "the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing." This distinction reaffirms the traditional principle that the "rights assured by the Fourth Amendment are personal rights [which] * * * may be enforced by the exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure." *Simmons v. United States*, 390 U.S. 377, 389, 88 S.Ct. 967, 974, 19 L.Ed.2d 1247 (1968).

The Court's rejection of the standing analysis in *Rakas* thus narrows our inquiry to one of determining which of the appellees have personally suffered an infringement of their fourth amendment rights, and, conversely, which have not. We turn our attention first to defendant Marvin L. Robinson, who, by his own admission, falls squarely within the latter category. Although there is some indication that Robinson was at one time an officer of the union, he "was not at any relevant time an officer or member of Local 1282; was not present at the union office at the time of the seizure of the records, [and] claimed no interest in any union records." We therefore find that Robinson had no personal right or interest in the union's records. Furthermore, the Supreme Court in *Alderman v. United States, supra*, 394 U.S. at 174, 89 S.Ct. at 967, specifically laid to rest any notion that there exists a constitutional right for a codefendant or coconspirator to "exclude relevant and probative evidence because it was seized from another in violation of the Fourth Amendment." Accordingly, we hold that Robinson has no valid

fourth amendment grounds upon which to object to the introduction of the local's records into evidence.

The thrust of the government's argument against the remaining three defendants is that they, like Robinson, have no personal interest in the records sufficient to invoke the fourth amendment's protection. Labor unions, themselves, have no serious argument in favor of an expectation of privacy, the government claims, because they are extensively regulated by federal law and are subject to the investigation procedures of the Labor Management Reporting and Disclosure Act.[3] In addition, it is suggested that the officers and members of the union are aggrieved only by the introduction of damaging evidence seized from the union, which is a third party. Finally, even if we are to find that the appellees had a personal interest in the union's records, the government argues that it is not sufficient to raise fourth amendment issues.

Allison and Greer base their argument for an expectation of privacy on the principles enunciated by the Supreme Court in *Mancusi v. DeForte, supra*, 392 U.S. at 369, 88 S.Ct. at 2124. The respondent in that case, Frank DeForte, was vice president of Teamsters Union Local 266. The office in which he worked consisted of a large room which was shared with several other union officials. DeForte spent a "considerable amount of time" in his office and was in custody of certain papers which were seized by government agents. Under these circumstances, the Court held that:

> DeForte had Fourth Amendment standing to object to the admission of the papers at his trial. It has long been settled that one has standing to object to a search of his office, as well as of his home. * * * It seems to us that the situation was not fundamentally changed because DeForte shared an office with other union officers. DeForte still could reasonably have expected that only those persons and their personal or business guests would enter the office, and that records would not be touched except with their permission or that of union higher-ups. This expectation was inevitably defeated by the entrance of state officials, their conduct of a general search, and their removal of records which were in DeForte's custody.

*Id.*

The quoted language would seem to remove any doubt that a union official has a right to expect some fourth amendment protection against unreasonable searches and seizures which take place in the union's office.[4] Moreover, we agree that the principles enunciated in *Mancusi v. DeForte* are applicable to the case at hand. We point out, in particular, that the Supreme Court stated that the "decision in *Katz v. United States*, 389 U.S. 347 [88 S.Ct. 507, 19 L.Ed.2d 576,] * * * makes it clear that capacity to claim the protection of the Amendment depends not upon a property

---

**3.** The government claims that a labor union's expectation of privacy is substantially reduced by virtue of 29 U.S.C. § 521, which permits the Secretary of Labor or his surrogates to investigate a labor union to "determine whether any person has violated or is about to violate any provision of" the Labor Management Reporting and Disclosure Act. The government thus suggests that labor unions "open themselves up" to otherwise impermissible governmental intrusions, and thereby reduce any expectation of privacy in the union's records. *See United States v. Biswell*, 406 U.S. 311, 316, 92 S.Ct. 1593, 1596, 32 L.Ed.2d 87 (1972). ("When a [firearms] dealer chooses to engage in this pervasively regulated business and to accept a federal license, he does so with the knowledge that his business records, firearms, and ammunition will be subject to effective" regulation under the provisions of the Gun Control Act of 1968, 18 U.S.C. § 923(g).).

In *G. M. Leasing Corp. v. United States*, 429 U.S. 338, 354, 97 S.Ct. 619, 629, 50 L.Ed.2d 530 (1977), however, the Court held that a corporation did not "open itself" to governmental intrusions where "the intrusion into petitioner's privacy was not based on the nature of its business, its license, or any regulation of its activities." Although we feel our case falls somewhere in between these two cases we are not willing to rest our decision on this basis. While 29 U.S.C. § 521 lowers a labor union's expectation of privacy in the face of labor department investigations, the same is not necessarily true of grand jury investigations or F.B.I. investigations.

**4.** *See* note 2, *supra*.

1260

right in the invaded place but upon whether the area was one in which there was a reasonable expectation of freedom from governmental intrusion." *Mancusi v. DeForte, supra,* 392 U.S. at 368, 88 S.Ct. at 2123–2124. And in our opinion, Allison and Greer had a reasonable expectation of privacy in the union records similar to the one which was found sufficient by the Court in *Mancusi v. DeForte.*

■ We have already pointed out that the Court in *Mancusi v. DeForte* stated that the right to claim the protection of the fourth amendment does not depend on a property right. Therefore, it is of little significance that Allison was not the proper custodian of the documents. What is of primary importance in this matter is whether there was a reasonable expectation of privacy in those documents. The record clearly shows that the documents and records were moved to the storage room in a disheveled state *after* the fire had occurred. Furthermore, a guard was posted there twenty-four hours a day to watch the building until a partition could be built which would enable the union to lock up the records. There is thus ample evidence to demonstrate that, as in *Mancusi v. DeForte, supra,* 392 U.S. at 369, 88 S.Ct. at 2124, the union officials could reasonably expect "that [the] records would not be touched except with their permission or that of union higher-ups." Accordingly, we hold that appellees Allison and Greer are entitled to claim the protection of the fourth amendment by moving to suppress the introduction of the union's records into evidence at trial. *See United States v. Lefkowitz,* 464 F.Supp. 227 (C.D.Cal.1979).

■ The circumstances relating to appellee Spires, however, are completely different. He was, at all times relevant to this proceeding, a member of Local 1282. He was not at the union hall, however, at the time of the search. He had no office there and he had no possessory interest in the union's records. In fact, Spires' only claim of interest is through his legal right, as a member of the union, of access to the records of the local under 29 U.S.C. § 431(c).

We find this level of interest in the union records to be insufficient to raise a reasonable expectation of privacy under any standards. The Supreme Court has repeatedly emphasized the high cost to society of suppressing evidence which could otherwise be used at trial against criminal defendants. See *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). We are therefore reluctant to extend the protection of the exclusionary rule where such a low expectation of privacy is involved.

II.

We next examine the issue of legal consent as it pertains to the facts of this case. The district court concluded that where the authority of a grand jury subpoena duces tecum is invoked by a law enforcement officer in obtaining consent for a search, the legal standards associated with a normal consent search situation are no longer applicable. The standard which was set forth by the district court is that of "knowing and informed consent." And the burden placed on the government in meeting this standard is a considerable one. The government must show either that the consenting party was informed by the officers of his or her right to refuse the search, or, in the alternative, it must be shown that the consenting party was somehow otherwise aware of his or her rights under the subpoena duces tecum.

■ We have thoroughly examined this issue, and are convinced that the traditional standards which control a so-called "normal" consent search situation are appropriate for the disposition of this case. We rely on the totality of the circumstances test adopted by the Supreme Court in *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

In *Schneckloth,* the respondent, Robert Bustamonte, moved at trial to suppress evidence which had been obtained in a search of an automobile in which he was a passenger. A police officer had legally stopped the car and was given permission by the driver to search it. Bustamonte claimed

emit... 

that the consent was involuntary because the driver was not informed of his right to refuse the search. In considering the appropriate standard for determining whether the consent was voluntary, the Supreme Court turned for guidance to cases which deal with voluntariness of a defendant's confession under the fourteenth amendment. After reviewing these cases the Court concluded that:

> The significant fact about all of these decisions is that none of them turned on the presence or absence of a single controlling criterion; each reflected a careful scrutiny of all the surrounding circumstances. See *Miranda v. Arizona,* 384 U.S. 436, 508 [86 S.Ct. 1602, 1645, 16 L.Ed.2d 694] (Harlan, J., dissenting); *id.,* at 534–535 [86 S.Ct., at 1659–1660] (White, J., dissenting). In none of them did the Court rule that the Due Process Clause required the prosecution to prove as part of its initial burden that the defendant knew he had a right to refuse to answer the questions that were put. While the state of the accused's mind, and the failure of the police to advise the accused of his rights, were certainly factors to be evaluated in assessing the "voluntariness" of an accused's responses, they were not in and of themselves determinative. (Citations omitted.)
>
> Similar considerations lead us to agree with the courts of California that the question whether a consent to a search was in fact "voluntary" or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent.

*Schneckloth v. Bustamonte, supra,* 412 U.S. at 226–27, 93 S.Ct. at 2047–2048.

In adopting the totality of the circumstances test, the Court rejected the argument that the government should prove at trial that the consent was given with full knowledge of the right to refuse such a search. In doing so, the Court specifically rejected, for proving voluntariness in a normal consent search situation, the two alternative requirements set forth by the district court in this case.

The first of these requirements was that the officers serving the subpoena duces tecum should inform the consenting party that they had the right to refuse the requested search. In addition to citing the practical difficulties in administering such a requirement, the Court in *Schneckloth* pointed out that "it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced." *Id.* at 233, 93 S.Ct. at 2050.

The alternative requirement imposed by the district court in this case is that of forcing the government to "otherwise" show that the consent was "knowing and informed." A similar argument was rejected by the Supreme Court in *Schneckloth* for normal consent search situations, where the respondent claimed that a consent constitutes a "waiver" of fourth and fourteenth amendment rights. Under this theory, the government would have been required to establish that a "knowing and intelligent" waiver of constitutional rights had been made:

> The argument is that by allowing the police to conduct a search, a person "waives" whatever right he had to prevent the police from searching. It is argued that under the doctrine of *Johnson v. Zerbst,* 304 U.S. 458, 464 [58 S.Ct. 1019, 1023, 82 L.Ed. 1461,] to establish such a "waiver" the State must demonstrate "an intentional relinquishment or abandonment of a known right or privilege."

*Id.* at 235, 93 S.Ct. at 2051–2052.

The Supreme Court's examination of the "knowing and intelligent" waiver requirement in *Schneckloth* led to the conclusion that the doctrine was inapplicable to search and seizure situations. The requirement was developed to protect other constitutional guarantees: "Almost without exception, the requirement of a knowing and intelli-

gent waiver has been applied only to those rights which the Constitution guarantees to a criminal defendant in order to preserve a fair trial." *Id.* at 237, 93 S.Ct. at 2052–2053. Moreover, the Court stated that the rigorous standard set forth in *Johnson v. Zerbst* for a waiver of rights would be "unrealistic * * * in the informal, unstructured context of a consent search," and "would be thoroughly inconsistent with our decisions which have approved 'third party consents.' " *Id.* at 245, 93 S.Ct. at 2057.

In light of the foregoing discussion, we see no reason to conclude, as the district court did, that the government should bear the burden of proving knowing and informed consent simply because the consent in this case followed the service of a grand jury subpoena duces tecum. That standard is derived from a body of law wholly separate from fourth amendment doctrine, and was designed to protect entirely different constitutional rights. And neither the district court nor the appellees have cited any authority which convinces us to apply it to the fourth amendment issue before us here. Moreover, the totality of the circumstances test is more suitable for an inquiry into the unstructured and unpredictable circumstances which often surround consent searches. A mechanistic approach which involves a reading of fourth amendment rights or which places an undue burden on the government at trial is not only cumbersome, but also offers an incomplete guarantee of protection against coercion. Only a consideration of all the circumstances will remove the suspicion of involuntariness from a consent search. We therefore hold, as indicated by the Supreme Court in *Schneckloth,* that "neither this Court's prior cases, nor the traditional definition of 'voluntariness' requires proof of knowledge of a right to refuse as the *sine qua non* of an effective consent to a search." *Id.* at 234, 93 S.Ct. at 2051. *See, e. g., Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *Davis v. United States,* 328 U.S. 582, 66 S.Ct. 1256, 90 L.Ed. 1453 (1946).

■ Accordingly, we reject the district court's legal conclusions and hold that in a search pursuant to the service of a subpoena duces tecum, as in normal consent search situations, "the question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte, supra,* 412 U.S. at 227, 93 S.Ct. at 2047–2048.

■ Since the issue of consent is usually a factual one, a district court's finding of involuntariness must be accepted on appeal unless the finding is clearly erroneous. *Martin v. United States,* 586 F.2d 1206, 1211 (8th Cir. 1978); *United States v. Hearn,* 496 F.2d 236, 242 (6th Cir.), *cert. denied,* 419 U.S. 1048, 95 S.Ct. 622, 42 L.Ed.2d 642 (1974). We feel, however, that the district court's finding of involuntariness in the present case resulted from the court's legal conclusions regarding the issue of consent. In particular, the trial court held that the government should have proved *knowing and informed consent,* and this led the court to conclude that there was no legally sufficient consent. There was no such consent, according to the court, because neither Greer nor Allison knew they had a right to withhold their consent and refuse to allow the search. As we have already indicated, however, there is no legal requirement that the government prove knowing and informed consent. Therefore, we are not bound by the trial court's holding insofar as it is based on its legal analysis.

■ One issue was raised, however, which properly falls within our review of the circumstances surrounding Greer's consent. The district court likened the situation in the present case to one in which consent for a search is obtained pursuant to an invalid search warrant or pursuant to a claim that the law enforcement officers have a search warrant when, in fact, none exists. In doing so, the court raised the factual issue of whether the subpoena duces tecum produced enough legally colorable coercion to reduce the consent of Greer to "mere acquiescence to claimed lawful au-

thority" to search. And since the district court concluded that "Greer, upon being handed the subpoena under the circumstances stated, believed that the subpoena empowered the agents to obtain and take the records," the court found that he merely acquiesced rather than voluntarily consented.

*Bumper v. North Carolina, supra,* 391 U.S. at 548–50, 88 S.Ct. at 1791–92, dealt with the coercion involved when a law enforcement officer obtains consent for a search after stating that he has a warrant to conduct the search. In *Bumper,* the investigating officers claimed that they had a search warrant, but none was ever produced at trial. Instead, the prosecution attempted to justify the search on the basis of consent. The Supreme Court in that case held that:

> When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. *This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority.* A search conducted in reliance upon a warrant cannot later be justified on the basis of consent if it turns out that the warrant was invalid. The result can be no different when it turns out that the State does not even attempt to rely upon the validity of the warrant, or fails to show that there was, in fact, any warrant at all.
>
> When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. *The situation is instinct with coercion— albeit colorably lawful coercion.* Where there is coercion there cannot be consent.

(Emphasis supplied.) (Footnotes omitted.)

The district court in the present case found the circumstances analogous to those in *Bumper,* and concluded that when permission to search is obtained pursuant to the service of a subpoena duces tecum, the law enforcement officers cloak themselves with the authority of the grand jury and give the occupant the impression that there exists no right to refuse the search. Any consent given on such a basis, according to the court, is "mere" acquiescence to a claim of lawful authority," and the coercion involved nullifies the voluntariness of the consent.

In support of this conclusion, the district court and the appellees cite several cases in which colorably lawful assertions of authority to search reduced whatever consent there was to "mere" acquiescence to a claim of lawful authority." Without indulging in a lengthy discussion of these cases, we simply point out that they are, for the most part, inapposite. Two of the cases dealt with search warrants. And one of the two was subsequently overruled *en banc. Hoover v. Beto,* 439 F.2d 913 (5th Cir. 1971), *rev'd en banc,* 467 F.2d 516, *cert. denied,* 409 U.S. 1086, 93 S.Ct. 703, 34 L.Ed.2d 673 (1972); *McCreary v. Sigler,* 406 F.2d 1264 (8th Cir.), *cert. denied,* 395 U.S. 984, 89 S.Ct. 2149, 23 L.Ed.2d 773 (1969) (determined on basis of validity of the warrant). Of the cases which actually involved the service of a subpoena duces tecum, one dealt with a situation in which an attorney was consulted before consent was given to the search, and the evidence was not suppressed. *Consumer Credit Insurance Agency v. United States,* 599 F.2d 770 (6th Cir. 1979). Another involved the gathering of records pursuant to a subpoena duces tecum over the *objection* of the custodians of the records. *In Re Nwamu,* 421 F.Supp. 1361 (S.D.N.Y. 1976).

One case has been cited by the parties which is particularly helpful in our consideration of this matter. In *United States v. Re,* 313 F.Supp. 442, 448 (S.D.N.Y.1970), an accountant was served a forthwith subpoena duces tecum by an agent of the Internal Revenue Service. Since the accountant was a relative of the parties who were the subjects of the investigation, there was some question as to whether the subpoenaed papers would be tampered with. The accountant was unable to immediately comply with the subpoena because his employer was unaware that he was performing services for other clients outside the scope of his

regular employment. Consequently, the Assistant U.S. Attorney in charge of the investigation excused immediate compliance and the accountant, in turn, agreed to turn over the records later that evening. In ruling on the admissibility of the evidence obtained from the accountant, the district court specifically considered the issue of whether the accountant's cooperation was voluntary or whether it was coerced:

Defendants' Fourth Amendment attack is vague and confusing. Initially they seem to urge that Blois did not deliver the papers called for in the subpoena to the Government voluntarily, but rather was coerced into so doing. They say that the vital distinction between a search warrant and a subpoena is that in the case of the former the Government takes by force while in the latter compliance is voluntary. *Hale v. Henkel*, 201 U.S. 43, 81, 26 S.Ct. 370, 50 L.Ed. 652 (1906) (concurring opinion of Justice McKenna). To say that in the case of subpoena duces tecum compliance is voluntary is an oversimplification. Of course, if the party to whom the subpoena is directed does not comply the officers may not disregard his refusal and seize documents subpoenaed. *Mancusi v. DeForte*, 392 U.S. 364, 88 S.Ct. 2120 [20 L.Ed.2d 1154] (1968). But the subpoena itself is a process of the court and in the sense that severe penalties may be imposed for willful resistance, the effect of the subpoena on one who does not wish to comply is unquestionably more compelling than a simple request for voluntary compliance.

But nothing that occurred here indicates that a seizure rather than voluntary compliance in the above sense took place.

We do not liken the present case to one in which a search is conducted pursuant to an invalid or nonexistent search warrant.[5] The agents did not misrepresent the validity or legal effect of the subpoena duces tecum. The subpoena duces tecum in the present case was validly issued and the union's ultimate compliance with it was required by law. Therefore, there is no comparison with an invalid or nonexistent search warrant where no compliance at all is necessary. There was a misunderstanding of its legal effect, perhaps, on the part of the union officials, but we have already indicated that there is no requirement of knowing and informed consent in the sense determined by the district court. We see a vast difference between a misrepresentation of legal authority and a misunderstanding of legal authority.

We also feel that, as in *United States v. Re*, there is nothing here to indicate that there was a seizure, rather than voluntary compliance. The agents did not coerce Greer into believing that they had legal authority to search. Greer read the subpoena, was aware that it called for the production of the records, and was aware that it was addressed to Allison. He nevertheless cooperated fully with the agents. And if he was under the mistaken impression that the agents had the authority to search the premises, the district court, at least, found that it was of little consequence: "[H]ad Mr. Greer been thoroughly advised of all his rights, he nevertheless would have consented. He was in a consenting frame of mind and a cooperative frame of mind. That's quite clear." Furthermore, although there is no indication that Greer or Allison consulted with the union's attorneys, they had

---

5. *Bumper* may be read to hold that a search can never be justified on the basis of consent when consent has been given after an official has asserted that he or she possesses a warrant. The Court stated:

A search conducted in reliance upon a warrant cannot later be justified on the basis of consent if it turns out that the warrant was invalid. The result can be no different when it turns out that the State does not even attempt to rely upon the validity of the warrant, or fails to show that there was, in fact, any warrant at all.

*Bumper v. North Carolina*, 391 U.S. 543, 549–50, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968). We feel that there is a great difference in the degree of coercion involved in serving a subpoena duces tecum as opposed to asserting the possession of a search warrant. A search warrant indicates to the occupant that he or she has no right to object to the search. A subpoena duces tecum, however, does not represent to the named party that he or she has no right to object to a search. A subpoena duces tecum requires only that certain records must be produced and brought before the grand jury issuing the subpoena.

ample opportunity to do so. We also point out that the district court did not find any of the coercive activities on the part of the agents which permit a meaningful analogy to the case of *In Re Nwamu, supra,* 421 F.Supp. 1361. We do not find in the present case, on the basis of the district court's factual findings, that a seizure over the objection of the subpoenaed party has taken place. We do not find anything but compliance, on the part of Greer, with a request of an officer serving a subpoena duces tecum to search for the documents referred to in the subpoena:

> They [the agents] told Mr. Greer that they had a subpoena for Union records and were there to get them, to which Mr. Greer responded, in effect, "Fine. We do not have anything to hide." They gave the subpoena to Mr. Greer, and he read it and then stated that he did not know if he could get together and find all the items in the subpoena.

We have reviewed all of the transcripts and the district court's factual findings in this case. In light of the court's other factual findings and the court's reliance on an inappropriate theory of legal consent, the legal and factual conclusion that there was not sufficient voluntary consent in this case is incorrect.

### III.

The second basis for the district court's holding is that there was no valid service of the subpoena duces tecum and that, consequently, the consent obtained from Greer was not valid. Since the subpoena was addressed to Allison, who was erroneously assumed to be the custodian of the records, the district court held that only Allison's permission would have been sufficient to constitute legal consent for the agent's search: "Even if the Government is correct as to its theory of legal consent, the consent must be that of the witness subpoenaed when the agents are proceeding on the presumed authority of a subpoena." We disagree.

While we do not take issue with the authorities cited in the appellees' brief which indicate that personal service of a subpoena duces tecum is required, we be-

lieve that they are inapplicable to the present case. In the first place, the consent of the party named in the subpoena duces tecum was not required because the search was not conducted on the authority of the subpoena. The search was conducted on the authority of the consenting party who was the person with legal custody of the records. Furthermore, a rule which would enable only the person named in the subpoena to consent to an agent's request to search would be in conflict with that body of law which allows searches to proceed on the authority of the consent of a third party in certain instances. *See Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

Accordingly, we reverse the district court's suppression ruling and hold that the evidence obtained in this case was obtained pursuant to the valid consent of the legal custodian of Local 1282's records. Reversed and remanded for further proceedings consistent with this opinion.