**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Jerome SUSSKIND (91–1003); James
Rumler (91–1004); and Scott Nickerson
(91–1005), Defendants–Appellants.**

Nos. 91–1003 to 91–1005.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 27, 1992.

Decided May 28, 1992.

Gary Felder, Office of U.S. Atty., Detroit, Mich. (argued and briefed), for U.S.

David I. Goldstein, Ann Arbor, Mich. (argued and briefed), for Jerome A. Susskind.

James J. Rumler, pro se.

Melvin Houston, Detroit, Mich. (briefed), Leslie R. Seeligson, Seeligson & Jordan, Ann Arbor, Mich. (argued), for James J. Rumler.

Robert M. Morgan, Detroit, Mich. (argued and briefed), for Scott Nickerson.

Before: JONES and NELSON, Circuit Judges; and LIVELY, Senior Circuit Judge.

NATHANIEL R. JONES, Circuit Judge.

Defendants, Jerome Susskind, James Rumler, and Scott Nickerson, appeal their convictions and sentences for conspiracy to obstruct and impede justice and other related counts. For the reasons that follow, we reverse.

I

The charges in the instant action arose out of a prior case. In that prior case ("*Rumler I*"), defendant Rumler was convicted of engaging in a conspiracy to import over 15,000 pounds of marijuana into the United States from July through September of 1986. The government contended that, as part of the conspiracy, Rumler and Jessie E. Harget, an alleged coconspirator, purchased a 1961 Aero Commander aircraft for approximately $59,000 in cash and used the aircraft to facilitate the importation of marijuana.

Susskind, as counsel for Rumler in *Rumler I*, contended during his opening statement that the airplane was used for legitimate purposes rather than for the charged conspiracy. Susskind also stated that Rumler had not obtained the money to purchase the airplane from Harget, but rather from Nickerson, who was a friend or business associate.

After hearing that opening statement, the prosecutor, Stanley Janice, decided to subpoena Nickerson to testify at the trial. The subpoena was served on November 28, 1988. It ordered Nickerson to bring with him all documents relating to the alleged loan to Rumler and all documents relating to his financial condition at the time of the alleged loan. At the time Nickerson was served with the subpoena, he advised the process server that there was not enough time to obtain the records, and that he would have to obtain them from his tax attorney.

After receiving the subpoena, Nickerson telephoned Susskind. Following their conversation, Susskind dictated to his secre-

tary, by telephone, some promissory notes relating to Rumler and Nickerson, which he needed prepared for the following day. Susskind's secretary, Karen Olds, typed the three requested documents the following day at Susskind's office. At the trial of the instant action, which the parties refer to as *"Rumler II,"* Olds testified that she remembered back-dating at least one of the documents by placing the date of August 5 on it, although she was unsure of the year.

On November 29, 1988, Nickerson informed the *Rumler I* prosecutor that he was having difficulty obtaining the documents requested by the subpoena. The following day, however, Nickerson gave the prosecutor the following documents: a promissory note dated June 3, 1986, referencing an alleged loan of $60,000 from Nickerson to Rumler; a promissory note dated August 5, 1986, referencing an alleged loan of $25,000 from Nickerson to Rumler; a discount note dated December 5, 1986, referencing Nickerson's alleged interest in the subject airplane; and a single sheet of paper containing a copy of a 1986 IRS form 1099 and a copy of a 1984 W–2 form. When the prosecutor asked about the other requested documentation, Nickerson allegedly responded that the other records had been stolen from the trunk of an automobile that belonged to a friend named Bob. The prosecutor maintains that Nickerson said that he did not know Bob's last name or whereabouts and admitted that he had not filed a police report regarding the alleged theft of records.

On December 6, 1988, federal agents seized physical items of evidence from Susskind's law office in Jackson, Michigan. These items included a Sharp typewriter, a print wheel, and a correction ribbon. Each of these items, along with expert testimony concerning them, was later presented by the government at trial in order to prove the charges against Susskind. The government obtained these items pursuant to a "forthwith" grand jury subpoena duces tecum rather than through the use of a warrant. The forthwith subpoena was addressed to Susskind and "any and all Office Personnel," Br. of Susskind app., and com-manded production of various typewriters, word processors, and related materials. On its face, the subpoena ordered the recipient to "[f]orthwith, [p]rovide all requested items immediately to S/A Timothy Bethel of the grand jury." *Id.* Four federal agents executed the subpoena and seized the evidence in this case: Timothy Bethel and William Carroll, U.S. Customs Service; Ed Fontanive, Internal Revenue Service; and Michael Yasenchak, Drug Enforcement Administration. Each agent was armed.

On October 19, 1989, the grand jury returned a fifteen-count indictment against the defendants, charging various counts of obstruction of justice and giving false information to a court. Counts one to fourteen related to allegations of falsified documentation and testimony in *Rumler I.* Count fifteen, against Susskind, involved his later attempt to obtain a new trial for Rumler by use of an affidavit that he allegedly knew to contain false information.

Susskind filed a pre-trial motion for an evidentiary hearing and to suppress evidence, with regard to the government's evidence attained through the use of the forthwith grand jury subpoena. On March 2, 1990, the district court held an evidentiary hearing, during which Susskind and the agents serving the subpoena testified as to the circumstances surrounding the service of the subpoena.

Special Agent Bethel testified that he entered Susskind's office in Jackson, Michigan and served upon Susskind the forthwith subpoena. After Susskind read the subpoena, he asked Bethel when he wanted the items. Bethel replied, "[I]t says on the subpoena forthwith, so I guess we'd like them now." Br. of United States at 51; Br. of Susskind at 13. The agents proceeded to seize the items listed on the subpoena. Susskind did not sign a form waiving his appearance before the grand jury, nor did he sign a consent to search form or its equivalent.

Susskind also testified at the evidentiary hearing. He stated that he had never seen a forthwith subpoena in his twenty-nine years as an attorney. Susskind further

testified that he was not informed and did not believe that he had a right to refuse the command of the subpoena. In fact, Susskind thought that, if he refused to obey it, he could be held in criminal contempt. Finally, Susskind testified that, had he been presented with a consent to search form, he would not have consented.

On cross-examination, Susskind testified, when questioned as to the possibility of making a motion to quash the subpoena, that he did not believe there was any way for him to make such a motion at that time. Susskind reiterated his testimony that he thought it would be contemptuous behavior to disobey the command of the forthwith subpoena that he immediately provide the requested items to Agent Bethel.

On June 14, 1990, the district court denied Susskind's motion to suppress, and the case proceeded to trial. Rumler and Nickerson testified at trial. Both of them maintained that the two promissory notes and the discount note were the actual documentation created with regard to the alleged loan that Rumler received to purchase the plane. Furthermore, Nickerson denied ever telling the prosecutor the story about "Bob"; he testified that he told the prosecutor only that the records had been misplaced. The prosecution, on the other hand, offered expert examination of the promissory and discount notes and the testimony of the seller of the airplane to prove that Susskind, Rumler, and Nickerson were engaged in a scheme to hide the truth.

On September 10, 1990, the jury found the defendants guilty of all counts charged in the indictment. On December 13, 1991, Rumler was sentenced to a total term of imprisonment of 168 months, a $5,000 fine, and a total special assessment of $300. Nickerson was sentenced to a total term of imprisonment of 84 months, a $5,000 fine, and a total special assessment of $250. On December 14, 1991, Susskind was sentenced to a total term of imprisonment of 120 months, a $5,000 fine, and a total special assessment of $400. Defendants now bring this appeal.

## II

All three defendants claim that the district court erred in refusing their request for discovery of certain documents. During *Rumler I*, Rumler wrote a letter to the United States Department of Justice, Public Integrity Section, complaining about the prosecutor's conduct during trial. The prosecutor wrote a letter in response. Janice also conducted the grand jury proceeding in the instant action. Defendants sought to discover both the prosecutor's letter in response to Rumler's complaint and a transcript of the prosecutor's statements during the grand jury proceeding. Our review of this issue involves statutory interpretation and is, accordingly, de novo. *See Trustees for Mich. Carpenters Council Health & Welfare Fund v. C.J. Rogers, Inc. (In re Michigan Carpenters Council Health & Welfare Fund)*, 933 F.2d 376, 388 (6th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 585, 116 L.Ed.2d 610 (1991).

The Jencks Act provides, in relevant part, as follows:

> After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any *statement (as hereinafter defined)* of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

Jencks Act, 18 U.S.C. § 3500(b) (1988) (emphasis added). The Act defines "statement" in subsection (e):

> The term "statement", as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means—
>
> (1) a written statement made by said witness and signed or otherwise adopted or approved by him;
>
> (2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim

recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury. *Id.* § 3500(e). The letter to the Justice Department clearly falls within subsection (e)(1). Similarly, the grand jury transcript is certainly "a transcription" of "a substantially verbatim recital of an oral statement made by" Janice. *Id.* § 3500(e)(2). The fact that some statements may be in an interrogative form, and thus constitute "questions," does not change our analysis. In fact, the government admitted at trial that Janice's verbatim comments in the trial transcript of *Rumler I* were Jencks Act statements. J.A. at 325. Nevertheless, the government urges a completely contradictory position with regard to his grand jury remarks. The fact that one document recorded statements made before a grand jury is irrelevant; the Jencks Act expressly provides for production of statements made to a grand jury.[1] *Id.* § 3500(e)(3). Thus, we find that, insofar as the defendants moved for production of the prior statements at issue here, both statements were properly subject to production under the Jencks Act.

The district court examined in camera the statements at issue here and concluded that the prior statements revealed no inconsistencies. Although § 3500(c) provides for examination in camera, such an examination is limited to the issue of whether the testimony deals with the same subject matter. Clearly, Janice's statements dealt with the same subject matter as his direct testimony in the instant trial: the alleged fabrication by defendants in *Rumler I*. The prosecutor's response to Rumler's letter of complaint also deals with the same subject matter: the prosecutor's conduct during *Rumler I* as it relates to his attempt to prove the alleged fabrication. Thus, the court should have admitted both statements.

Our discussion must now turn to the effect of the district court's and the government's violation of the Jencks Act. The Supreme Court has applied a harmless error analysis to Jencks Act violations. In *Rosenberg v. United States*, 360 U.S. 367, 79 S.Ct. 1231, 3 L.Ed.2d 1304 (1959), the Court held as follows:

An appellate court should not confidently guess what defendant's attorney might have found useful for impeachment purposes in withheld documents to which the defense is entitled. However, when the very same information was possessed by defendant's counsel as would have been available were error not committed, it would offend common sense and the fair administration of justice to order a new trial. There is such a thing as harmless error and this clearly was such.

*Id.* at 371, 79 S.Ct. at 1234. Similarly, in *United States v. Pope*, 574 F.2d 320 (6th Cir.1978), *cert. denied*, 436 U.S. 929, 98 S.Ct. 2828, 56 L.Ed.2d 774, 436 U.S. 949, 98 S.Ct. 2856, 56 L.Ed.2d 792, 439 U.S. 868, 99 S.Ct. 195, 58 L.Ed.2d 179 (1978), this court held that a Jencks Act violation is curable if the trial judge, later in the same trial, provides the statements and recalls the witness to the stand. *Id.* at 326–27. In our case, however, defendants' counsel did not have "the very same information" as in *Rosenberg*, and it is too late to reopen proof as in *Pope*.

The Supreme Court has cautioned against overbroad use of the harmless-error analysis in Jencks Act cases: "Since courts cannot 'speculate whether [Jencks material] could have been utilized effectively' at trial, *Clancy v. United States*, 365 U.S. 312, 316, 81 S.Ct. 645, 648, 5 L.Ed.2d 574 (1961), the harmless-error doctrine must be strictly applied in Jencks Act cases." *Goldberg v. United States*, 425 U.S. 94, 111 n. 21, 96 S.Ct. 1338, 1348 n. 21, 47 L.Ed.2d 603 (1976) (alteration in original). Nonetheless, the government would have us follow *United States v. Welch*, 817 F.2d 273 (5th Cir.), *cert. denied*, 484 U.S.

---

1. The district court labored under the misconception that the defendants had to show a "particularized need" to obtain the grand jury transcript. J.A. at 918.

955, 108 S.Ct. 350, 98 L.Ed.2d 376 (1987). There, the Fifth Circuit reaffirmed its position that the district court and court of appeals may decide the issue of harmless error by comparing improperly withheld Jencks Act statements to the witness's testimony at trial, to determine whether there are any inconsistencies. *Id.* at 274. Whatever the wisdom of that approach on the facts in *Welch,* we reject it here. Declaring harmless error whenever a court fails to locate inconsistencies has the potential to swallow the entire Jencks Act. In theory, a party could never predicate error on a Jencks Act violation where a district court, like the district court in the instant case, examines in camera the Jencks Act material, looking for inconsistencies. The Act was intended to require the production of the prior statements, not to institute a court-supervised screening procedure for such statements.[2] Because the Fifth Circuit's approach would require us to "confidently guess what defendant's attorney might have found useful for impeachment purposes in withheld documents to which the defense is entitled," *Rosenberg,* 360 U.S. at 371, 79 S.Ct. at 1234, or to " 'speculate whether [Jencks material] could have been utilized effectively' at trial," *Goldberg,* 425 U.S. at 111 n. 21, 96 S.Ct. at 1348 n. 21 (alteration in original) (quoting *Clancy,* 365 U.S. at 316, 81 S.Ct. at 648), we decline to follow that approach. Our finding that the error here was not harmless necessitates a new trial. *See id.* 425 U.S. at 111–12, 96 S.Ct. at 1348–49.

### III

■ All three defendants next claim that the district court erred in denying their motions for dismissal of certain counts, consolidation of certain counts, or both. They all claim that counts one and two are duplicitous. Count one charges conspiracy to obstruct justice in violation of 18 U.S.C. § 1503 (1988), while count two charges conspiracy to submit false declarations before a court in violation of 18 U.S.C. § 1623

(1988). Because multiplicity implicates the Double Jeopardy Clause of the Fifth Amendment, our review of this issue is de novo. *See Costo v. United States,* 904 F.2d 344, 346 (6th Cir.1990).

■ The test for multiplicity " 'is whether each provision requires proof of a fact which the other does not.' " *Id.* at 347 (quoting *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932)). It suffices to say that the rendering of false testimony (§ 1623), standing alone, is not an obstruction of justice (§ 1503). *United States v. Essex,* 407 F.2d 214, 218 (6th Cir.1969).

■ The defendants do not seriously challenge the fact that the substantive crimes of § 1503 and § 1623, which underlie the conspiracy charges of counts one and two, have different elements. Rather, they contend that there was only one conspiratorial agreement. The evidence at trial, however, supported the conclusion that the decision to testify falsely regarding Nickerson's alleged loan to Rumler was made prior to trial, while the decision to manufacture false documentation was made later, in response to the subpoena to produce documentation. For the same reason, the substantive charges against Nickerson of making a false declaration in violation of § 1623, against Nickerson and Rumler of obstructing justice in violation of § 1503, and against Nickerson and Rumler of using a false document in violation of 18 U.S.C. § 1001 (1988) all represent separate and distinct offenses.

### IV

■ Susskind contends that the grand jury's subpoena duces tecum violated his Fourth Amendment rights, because the subpoena, unlike a warrant, is issued without a showing of probable cause. In the alternative, he contends that the fact that the subpoena ordered the records to be surrendered "forthwith" and "immediate-

---

**2.** Similarly, we hesitate to sanction the view that the only substantial use of Jencks Act material is to discover inconsistencies. In this regard, we note that the letter from Janice to the Justice

Department contains information relevant to the withdrawal, based on conflict of interest, of Susskind's original counsel, Neil Fink.

ly" violated his Fourth Amendment rights.[3] The question of whether Susskind voluntarily complied with the subpoena, or whether the evidence was obtained under duress or by coercion, is a question of fact to be determined from the totality of circumstances. *See United States v. Taylor*, 956 F.2d 572, 577 (6th Cir.1992) (en banc). Under *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968), the government has the burden of showing that consent was freely and voluntarily given. *Id.* at 548, 88 S.Ct. at 1791. As stated by the *Bumper* court, "[t]his burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Id.* at 548–49, 88 S.Ct. at 1792. The district court's findings with regard to consent will not be reversed, however, unless they are clearly erroneous. *Taylor*, 956 F.2d at 577.

■■■■■ Grand jury subpoenas duces tecum are clearly not per se violations of the Fourth Amendment, as long as the government is seeking relevant evidence for a legitimate purpose. *See In re Grand Jury Subpoena (Battle)*, 748 F.2d 327, 330 (6th Cir.1984); Fed.R.Crim.P. 17(c) (expressly authorizing such subpoenas). Furthermore, Susskind bears the burden of proving that the subpoena was unreasonably sweeping in its terms. *See United States v. Dionisio*, 410 U.S. 1, 11, 93 S.Ct. 764, 770, 35 L.Ed.2d 67 (1973).

■■ The issue in this case, therefore, is limited to whether the "forthwith" nature of the subpoena invites a Fourth Amendment challenge. This circuit upheld a forthwith grand jury subpoena duces tecum against a Fourth Amendment challenge in *Consumer Credit Ins. Agency v. United States*, 599 F.2d 770 (6th Cir.1979), *cert. denied*, 445 U.S. 903, 100 S.Ct. 1078, 63 L.Ed.2d 318 (1980). In finding that the plaintiff surrendered the records voluntarily, the *Consumer Credit* majority reasoned as follows:

> Our review of the record convinces us that there is much in the conduct of the officers here which we cannot approve if plaintiffs' version of the facts is to be believed. Nonetheless, after personally hearing the witnesses, Judge Krupansky elected to assign greater weight and credibility to the government's witnesses than to the plaintiffs' with respect to the issue of voluntariness. In support of his finding is the fact that plaintiffs' agents consented to the examination and delivery of documents only after advice of their counsel, Jackson, and his associate, Kalette, who was present at the scene during the entire episode and who oversaw and approved the final delivery of possession to the agents. *It is also noteworthy that Jackson testified to having advised Bosse that he was not required to turn over the documents sought.*

*Id.* at 773 (emphasis added). Susskind testified that, although he is an attorney, he

---

3. In passing, Susskind notes in his brief that a forthwith subpoena is in fact more onerous than a search warrant, because a forthwith subpoena implicates the Fifth Amendment. A forthwith subpoena, unlike a search warrant, is served upon a person who must then immediately produce the required evidence. This act of production alone can have serious self-incriminatory effects on the person served. *See United States v. Doe*, 465 U.S. 605, 611–14, 104 S.Ct. 1237, 1241–43, 79 L.Ed.2d 552 (1984) (act of production of records is afforded Fifth Amendment protection because such an act admits the existence, possession, and authenticity of the records demanded). Susskind must demonstrate, however, that the act of production had more than minimal testimonial value. *Id.* at 613, 104 S.Ct. at 1242; *see also Fisher v. United States*, 425 U.S. 391, 412 n. 12, 96 S.Ct. 1569, 1582 n. 12, 48 L.Ed.2d 39 (1976) (noting that "[t]he 'implicit authentication' rationale,"

which applies where the act of production serves to authenticate the items seized, "appears to be the prevailing justification for the Fifth Amendment's application to documentary subpoenas"). This inquiry is very fact specific: "whether the tacit averments of the [defendant] are both 'testimonial' and 'incriminating' for purposes of applying the Fifth Amendment" are questions that "do not lend themselves to categorical answers; their resolution may instead depend on the facts and circumstances of particular cases." *Id.* at 410, 96 S.Ct. at 1581. Insofar as the evidentiary hearing in this case addressed only evidence relating to Susskind's Fourth Amendment rights, we decline to reach the Fifth Amendment issue. Accordingly, we treat Susskind's argument as one that was not raised below, and as a general rule, appellate courts will not consider issues raised for the first time on appeal. *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 243–44 (6th Cir.1991).

had never, in twenty-nine years, seen a forthwith subpoena. He thought that he could be held in contempt if he did not comply immediately. The officers serving the subpoena affirmed his belief. Under the circumstances of the instant case, the dissenting member of the *Consumer Credit* panel seems to have the better argument: "[i]n this context the use of the forthwith command itself became coercive." *Id.* at 776 (Weick, J., dissenting).

Nonetheless, the Supreme Court has rejected the argument that knowledge of a right to refuse is an essential element of an effective consent. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). The district court recognized this fact, as evidenced by its reliance upon *United States v. Allison,* 619 F.2d 1254 (8th Cir.1980). There, the Eighth Circuit held that the securing of records by agents after presentment of a subpoena duces tecum, without specifically informing the defendants of their legal rights regarding the subpoena, did not vitiate the defendants' voluntary compliance in response to the subpoena:

> We therefore hold, as indicated by the Supreme Court in *Schneckloth,* that "neither this Court's prior cases, nor the traditional definition of 'voluntariness' requires proof of knowledge of a right to refuse as the *sine qua non* of an effective consent to a search." [412 U.S. at 234, 93 S.Ct. at 2051.]
>
> Accordingly, we reject the district court's legal conclusions and hold that in a search pursuant to the service of a subpoena duces tecum, as in normal consent search situations, "the question whether a consent to search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." [*Id.* at 227, 93 S.Ct. at 2047-48.]

*Allison,* 619 F.2d at 1262 (citations omitted). In the instant case, the district court found that Susskind voluntarily consented, relying in part on Susskind's admission "that he was aware of no subpoena that could not be subjected to a motion to quash." J.A. at 156. Similarly, the court found that Susskind was under no duress. We cannot say that these findings are clearly erroneous.

In *Bumper,* the Supreme Court held that there can be no legally effective consent following an officer's declaration that he or she has a search warrant; under such circumstances, "consent" would mean nothing more than "acquiescence to a claim of lawful authority." 391 U.S. at 548-49, 88 S.Ct. at 1791-92. By upholding the forthwith grand jury subpoena duces tecum in *Consumer Credit,* this court tacitly rejected the extension of *Bumper's* holding to forthwith subpoenas. *See generally Allison,* 619 F.2d at 1262-65 (expressly rejecting application of *Bumper* to grand jury subpoenas). At least one court has relied on *Bumper,* however, to support the proposition that evidence seized over a defendant's objection was obtained by mere acquiescence. *In re Nwamu,* 421 F.Supp. 1361, 1366 (S.D.N.Y.1976). This reasoning is, of course, circular, because if there was an objection, there was certainly no consent. Nonetheless, *Nwamu's* holding is completely consistent with Sixth Circuit authority. *Cf. United States v. Jones,* 641 F.2d 425, 429-30 (6th Cir.1981) (finding submission to authority rather than voluntary waiver where permission to search was granted only because officers repeatedly kicked defendant's door). The fact remains, however, that Susskind did not object. Accordingly, we find no legal basis to overturn the district court's factual finding of consent.

V

For the reasons delineated in part II, *supra,* the district court's judgment is REVERSED, the defendants' convictions and sentences are VACATED, and the case is remanded for further proceedings consistent with this opinion.

DAVID A. NELSON, Circuit Judge, concurring in part and dissenting in part.

I concur in Parts I, III and IV of the court's opinion, but I respectfully dissent from Part II and from the judgment. To the extent that the district court erred in

not requiring production of the grand jury transcript and the letter relating to defendant Rumler's charge of prosecutorial misconduct in *Rumler I*, I think the error was clearly harmless.

The Jencks Act does not require the production of anything except a "statement ... which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b). In the grand jury proceedings that led to issuance of the indictments in *Rumler II*, Assistant United States Attorney Janice gave the grand jury a brief "overview" of the *Rumler I* investigation. This overview constituted a "statement," and the government readily acknowledged before the district court that Mr. Janice had made statements on the grand jury transcript that "may" be construed as Jencks Act material. The overview obviously fell in this category, and it obviously should have been produced. The failure to produce it, however, resulted in no conceivable prejudice to any of the defendants.

The statement before the grand jury merely indicated that there had been a trial in *Rumler I* for the importation of marijuana by air; that a question arose as to where the money to buy the airplane came from; that there was an indication that the money came from a person named Scott Nickerson; that a subpoena was issued directing Mr. Nickerson to produce his records on a day certain; that he provided some documents on the day following the specified date; and that a police laboratory analyzed the documents to see whether they had been prepared in 1986 (the time specified on the face of the documents) or had been falsified later. The statement contained absolutely no information of which the defendants were not fully aware, and it was entirely consistent with Mr. Janice's testimony at trial. Almost everything else said by Mr. Janice before the grand jury constituted either statements that did not relate to the subject matter on which he subsequently testified (advice to grand jury witnesses on their legal rights, *e.g.*) or questions posed to witnesses.

There may be rare occasions when a lawyer's question to a witness can constitute a "statement" by the lawyer, but it does not seem to me that this grand jury proceeding represented such an occasion. As I read the transcript, it shows that Mr. Janice was doing nothing more than asking straightforward questions; he was not making "statements" in the normal usage of that term.

In any event, I am at a loss to understand how the defendants could have benefited from knowing the precise wording of the questions Mr. Janice posed to the witnesses before the grand jury. Counsel for one of the defendants stated frankly, in argument to the district court, that he was more concerned about the letter Mr. Janice wrote to the Department of Justice in response to Rumler's misconduct charge than he was about the grand jury transcript. I have *no reason to doubt* that counsel for the other defendants would have shared that view.

The letter in question is relatively brief, consisting of only six paragraphs. It has nothing to do with the defendants' falsification of the documents, because Mr. Rumler's charges of prosecutorial misconduct had nothing to do with that subject. What Rumler's complaint dealt with, insofar as it related to Mr. Janice, was the alleged fabrication of evidence by the government to show Rumler's involvement in a criminal conspiracy to smuggle marijuana into the United States. It did not deal at all with the alleged falsification of documents by Rumler and his friends.

Mr. Janice's response starts out by describing the charges of prosecutorial misconduct, and it goes on to deny Rumler's charge that Janice conspired to manufacture evidence of marijuana importation. The letter explains that the marijuana case was developed primarily by another assistant United States Attorney—a fact brought out in the *Rumler II* trial and never challenged by the defendants—with Mr. Janice becoming involved only after the debriefing of key witnesses had been completed.

With reference to a charge by Rumler that Janice "deceived and deluded" the trial

judge in *Rumler I*, the letter makes the obvious point that the record of those judicial proceedings speaks for itself. The letter also points out that Rumler made no such contention in his brief on appeal.

The letter then gives a short description of the indictment against the defendants in *Rumler II*, asserts that a person incarcerated with Rumler reported to federal agents that Rumler had told him he made his allegations in an effort to derail the investigation that led to the second indictment, and concludes with a flat denial that Rumler's charges are true. The letter contains no information on the withdrawal of defendant Susskind's original counsel, Neil Fink, and as far as I can see it contains nothing whatever that could have been of any possible use to the defendants in cross-examining Mr. Janice on the matters about which he testified in *Rumler II*.

Mr. Janice's direct testimony in the *Rumler II* trial explained what happened during the earlier trial on the marijuana charges and dealt extensively with the falsified documents; it did not touch on Rumler's allegations of prosecutorial misconduct in proving the conspiracy to import marijuana. For the most part, the subject matter of Mr. Janice's direct testimony in *Rumler II* and the statements in Mr. Janice's subsequent letter to the Department of Justice are only tangentially related—and although the relationship may be close enough to bring the letter within the Jencks Act, any error in not requiring the production of the letter was patently harmless.

With the possible exception of what the letter says as to Rumler's telling a fellow prisoner about his effort to derail the *Rumler II* investigation, and the far-from-surprising fact that Janice denied Rumler's misconduct charges, the letter contains no information that was not known by all three defendants. It contains nothing inconsistent with the testimony that Mr. Janice gave on direct examination, and it has no apparent impeachment value.

Even the strictest application of the harmless error doctrine should not, in my view, necessitate a new trial here. See *United States v. Sink*, 586 F.2d 1041, 1050–51 (5th Cir.1978) (failure to produce government agent's investigative report was harmless error even though there were minor discrepancies between the report and the agent's testimony), *cert. denied*, 443 U.S. 912, 99 S.Ct. 3102, 61 L.Ed.2d 876 (1979); *United States v. Welch*, 817 F.2d 273, 274 (5th Cir.) (failure to produce a witness' reports was harmless error because there were no apparent inconsistencies), *cert. denied*, 484 U.S. 955, 108 S.Ct. 350, 98 L.Ed.2d 376 (1987); *United States v. Roberts*, 848 F.2d 906, 908 (8th Cir.) ("In the absence of evidence of either bad faith on the part of the government or prejudice to the defendant, a failure to disclose Jencks Act material ordinarily will not result in a reversal"), *cert. denied*, 488 U.S. 931, 109 S.Ct. 322, 102 L.Ed.2d 340 (1988); *United States v. Sanchez*, 927 F.2d 376, 379 (8th Cir.1991) (same); *United States v. Boshell*, 952 F.2d 1101, 1105 (9th Cir.1991) ("Without any suggestion that the notes would have helped appellant overcome the hard evidence the district court used to convict him, we cannot reverse"); *United States v. Sperling*, 726 F.2d 69, 72 (2d Cir.) ("even if the government withheld the [Jencks Act] tape deliberately, which it denies," reversal is not required where "there is no reasonable likelihood that the timely production of the tape would have affected the verdict"), *cert. denied*, 467 U.S. 1243, 104 S.Ct. 3516, 82 L.Ed.2d 824 (1984).

In the case at bar there is simply no reasonable likelihood that production of Mr. Janice's letter or the grand jury transcript would have affected the verdict. Accordingly, and because I see no merit in any of the defendants' remaining assignments of error, including the ones we have not felt it necessary to discuss, I would affirm the convictions.