UNITED STATES of America, Plaintiff–Appellee,

v.

Jesus Antonio CALVO, Defendant–Appellant.

No. 88–1371.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 8, 1988.

Decided Dec. 19, 1988.

Thomas A. Gibbons, Chicago, Ill., for defendant-appellant.

Sheila Finnegan, Asst. U.S. Atty., Anton R. Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before BAUER, Chief Judge, WOOD and RIPPLE, Circuit Judges.

BAUER, Chief Judge.

Jesus Antonio Calvo appeals from his convictions for possession with intent to distribute cocaine, 21 U.S.C. § 841(a)(1), and conspiracy to distribute cocaine, 21 U.S.C. §§ 841(a)(1) and 846. He contends that the district court committed a number of errors warranting reversal of his convictions. We disagree with each contention, however, and affirm.

I.

Acting on an informant's tip, law enforcement officers established surveillance

of a building at 1412 West Irving Park Road in Chicago on July 20, 1987. At about 4:00 p.m. that afternoon, Calvo pulled up in front of the building in a white Cadillac. Guillermo Daza, Jose Garcia, and Luz Guevera also were in the car. Calvo entered the building carrying a brown paper bag. While inside, he telephoned a mobile phone connected to the Cadillac's cigarette lighter and requested Daza to join him. Daza, carrying a large envelope and the mobile telephone, then entered the building.

As Daza entered the building, Garcia and Guevera circled the area in the Cadillac. A short time later, they picked up Daza and Calvo, and proceeded to drive in a "circuitous" manner around the area. Inside the Cadillac, Calvo had a pager, which he used seven or eight times while in the car. He also talked on the mobile telephone a number of times, using code words to refer to drugs. At one point, Calvo got out of the Cadillac and boarded a city bus, instructing Daza to drive around until Calvo called him on the mobile telephone. Daza then drove the Cadillac to a tavern, which he and Guevera entered, taking the mobile telephone with them. They left a short time later and, with Guevera, drove around some more, in the process stopping to make more telephone calls. After a while, they picked up Calvo in the same place where he earlier had boarded the city bus.

Calvo proceeded to drive the Cadillac to the vicinity of Armitage and Kenneth Streets in Chicago, where he got out of the car and spoke with two men. Calvo then drove the Cadillac a short distance and parked near a brown Ford. Calvo gave Garcia the keys to the Ford and told Garcia to follow the Cadillac, which Garcia did. Calvo, driving the Cadillac, soon made a right-hand turn; when Garcia followed in the Ford, he ran a red light. At that point, law enforcement officers stopped both the Ford and the Cadillac.

When the officers questioned Calvo, Daza, and Guevera, they claimed never to have seen the brown Ford or Garcia, its driver. Garcia, in turn, denied knowing anything about the Cadillac or its occupants. Inside the Ford, the officers found ten packages of cocaine concealed behind the car's side panels. In all, the packages contained ten kilograms of 97 percent pure cocaine worth millions of dollars on the street. Inside the Cadillac, the officers found the mobile telephone, a test tube, and a test tube holder, among other things. Calvo had a beeper on his belt when he was arrested and was carrying a California driver's license and Florida vehicle registration card, each bearing his name. Guevera had two screw drivers in her purse.

On August 26, 1987, Calvo, Daza, Garcia, and Guevera together were charged in an information with possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1), and with conspiracy to commit that offense in violation of 21 U.S.C. § 846. After Daza, Garcia, and Guevera pled guilty on September 9, 1987, Calvo was charged with the same offenses in a superseding indictment filed on November 25, 1987. Following a jury trial, Calvo was found guilty of both offenses. The district court sentenced him to 16 years in prison, a $25,000 fine, 15 years supervised release, and five years probation.

## II.

### A.

Calvo's first contention is that the district court violated his Sixth Amendment right to confront and cross-examine witnesses when it permitted the government to read into evidence a statement made by Daza at the time he pled guilty. At his guilty plea, Daza, who did not testify at Calvo's trial, told the district court his version of what occurred on July 20, 1987, the day he and the others were arrested. Later during the same proceeding, the district court asked Guevera for her version of that day's events. In response to the court's first question "What did you do that day, July 20, 1987?," Guevera responded, "the same thing that Mr. Daza says."

Guevera *did* testify at Calvo's trial, and defense counsel during his cross-examination began to question her about statements she made during her guilty plea. At

a sidebar requested by the government, defense counsel explained his intentions:

> My theory is this: I am going to go into the fact that she had to make a statement on the day she pled guilty and she had to tell [the court] about her involvement, and that she knew if she showed herself to only have a minor role in this transaction, that she would get a better sentence.

The court then ruled that it would permit that line of questioning only if defense counsel actually confronted Guevera with her prior statement, at which point the prosecutor warned defense counsel that Guevera "signed a plea agreement that has the government's recitation of facts. Now if you go along with that, I'll put that in as a prior consistent statement."

Undaunted, defense counsel during Guevera's cross-examination read the court's questions and Guevera's answers from the transcript of her guilty plea, including her statement that she had on July 20, 1987 done the "same thing Mr. Daza says." After defense counsel finished, the government sought to read into evidence Daza's statement of what occurred on July 20, 1987, arguing that Guevera had adopted Daza's statement in her colloquy with the court at the guilty plea. Defense counsel argued that Daza's statement should not be read into evidence because, after stating that she did the same thing Daza did on the day of her arrest, Guevera at her guilty plea "clarified what her statement of facts were, and she went on to state what she meant and what her versions of what happened was in some detail." The district court ruled, however, that because Guevera adopted Daza's statement as her own during her plea, defense counsel opened the door to Daza's statement being read into evidence by reading Guevera's statement into evidence.

Calvo argues that the district court's ruling violated his Sixth Amendment rights because he had no opportunity to cross-examine Daza when he gave his statement at the guilty plea. This argument is without merit, however, if, as the district court found, Guevera did in fact adopt Daza's statement as her own at the guilty plea. Calvo argues that Guevera did not adopt Daza's statement because, after her reference to Daza's statement, Guevera gave her own version of the events of July 20, 1987. But the district court rejected this argument at trial and we cannot conclude that it abused its discretion in doing so. Indeed, the district court heard Guevera's statements at her and Daza's guilty plea and thus was in an advantageous position to determine whether Guevera did, in fact, adopt Daza's statements as her own. Calvo also argues that, even if the district court correctly concluded that Guevera adopted Daza's statement, its prejudicial effect outweighed any probative value it might have had. Again, we disagree. In our view, defense counsel made a considered tactical decision in choosing to question Guevera about her statement at the guilty plea. Calvo cannot complain of it now.

### B.

Calvo also asserts that the district court erred in making a number of other evidentiary rulings at trial. He claims that he was denied a fair and impartial trial when the court refused to exclude (1) testimony by Guevera that she recently had come to the United States from Columbia; (2) testimony by Garcia that he was from Columbia and that he heard Calvo use the word "apparatus," which he knew was a Columbian code word meaning one kilogram of cocaine; (3) testimony concerning the purity level and street value of the cocaine confiscated from the brown Ford; and, (4) records of telephone calls made to and from Calvo's mobile telephone during the period of July 17–20, 1987, and the California driver's license and Florida vehicle registration bearing Calvo's name. According to Calvo, any probative value of the above testimony was outweighed by its prejudicial effect on the jury and the documentary evidence was irrelevant.

We find no error, however, in any of the court's rulings with respect to these evidentiary matters. As for Calvo's first two contentions, we note that because Cal-

vo on the day he was arrested used a Columbian code word for a kilogram of cocaine—an important item of evidence of his guilty knowledge—Garcia's testimony that he was from Columbia was necessary to show how he knew the meaning of the code word. In addition, the district court, among other actions taken to minimize any prejudice to Calvo resulting from his nationality, instructed the jurors at the conclusion of all the evidence that they should not be influenced by any person's national ancestry. As for Calvo's third contention, certainly the purity of the cocaine and its street value were relevant to whether Calvo intended to distribute that cocaine. *See United States v. Costa*, 691 F.2d 1358, 1361-62 (11th Cir.1982); *United States v. Kelly*, 679 F.2d 135, 136 (8th Cir.1982) (per curiam). We simply cannot conclude that the admission of such testimony about the cocaine's qualities was not within the trial court's broad discretion.

 Finally, the court did not abuse its discretion in admitting the documentary evidence. With respect to the phone records, Calvo failed to object to their introduction at trial and we cannot possibly conclude that the district court committed plain error in failing to exclude them. *See United States v. Kerley*, 838 F.2d 932, 937 (7th Cir.1988) ("A plain error is not just one that is conspicuous but one whose correction is necessary to prevent a 'miscarriage of justice.' ") (quoting *United States v. Young*, 470 U.S. 1, 15 and n. 12, 105 S.Ct. 1038, 1047 and n. 12, 84 L.Ed.2d 1 (1985)). Testimony at trial showed that drug dealers often use mobile and pay telephones as well as beepers when buying and selling drugs to minimize the risk of detection. The telephone records, therefore, were circumstantial evidence that Calvo was engaged in a conspiracy to, and did in fact, distribute drugs. The driver's license and vehicle registration also were relevant because they showed that Calvo resided in both California and Florida, and some of the phone calls made from Calvo's mobile telephone were to Miami, Florida, and Los Angeles, California. In addition, the brown Ford had California license plates.

In short, none of Calvo's contentions has any merit whatsoever, and the district court therefore is

AFFIRMED.