**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Mark A. CARR, Defendant–Appellant.**

No. 91–1525.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 11, 1992.
Decided June 8, 1992.

Brent Westerfeld, Indianapolis, Ind., Edward A. Heffernan, Cleveland, Ohio, for defendant-appellant.

Before CUMMINGS, Circuit Judge, ESCHBACH, and WOOD, Jr., Senior Circuit Judges.

HARLINGTON WOOD, Jr., Senior Circuit Judge.

Mothers-in-law are, for some no doubt unjustified reason, not always the most popular family members, but in this case Defendant Mark Alan Carr decided to do something about it. In 1990 Carr confided in Thomas D. Kerns, also known as Gypsy, as related by him at trial, that he, Carr, "was having problems in Florida with a [former] mother-in-law and that he would like to see her take a trip, a fishing trip, and not return." The contemplated murder of Barbara Norwood, the former mother-in-law of Carr's wife, Brenda, was never accomplished, but this case began with that conversation.

In 1990 the defendant was indicted on three counts of murder for hire in violation of Title 18, U.S.C. § 1958,[1] and convicted later that year. He now raises three trial errors and objects to the fact that at sentencing the district judge enhanced his offense level under the guidelines instead of reducing it as the defendant sought.

*Factual Background*

The defendant and Gypsy, not previously acquainted, encountered each other by chance at a local garage in Veedersburg, Indiana, where Gypsy had gone to pick up his van. Police had stored his van while Gypsy served a little time in jail for drunk driving instead of just passing through

Christina McKee, Asst. U.S. Atty., Kathleen M. Sweeney, Indianapolis, Ind., for plaintiff-appellee.

---

1. Title 18, U.S.C. § 1958, provides in pertinent part as follows:

    (a) Whoever travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or uses or causes another (including the intended victim) to use the mail or any facility in interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, shall be fined not more than $10,000 or imprisoned for not more than ten years, or both; and if personal injury results, shall be fined not more than $20,000 and imprisoned for not more than twenty years, or both; and if death results, shall be subject to imprisonment for any term of years or for life, or shall be fined not more than $50,000, or both.

Veedersburg on his way back home to Norfolk, Virginia. The idea of sending the defendant's wife's former mother-in-law on a one-way "fishing trip" began to develop. The defendant assured Gypsy he was serious about it and gave Gypsy his business card. Gypsy suggested he might be able to find somebody to help with the proposed fishing trip. Gypsy then got his van and headed out of town east toward Indianapolis. A little later the defendant in his car managed to catch up with Gypsy, who pulled over to the side of the highway when he saw the defendant. At the roadside conference the defendant gave Gypsy the names and addresses of Larry Norwood—the former husband of defendant's wife, Brenda—and Barbara Norwood—Larry's mother and, thus, Brenda's former mother-in-law. The defendant and his wife had been involved in a long and bitter custody battle with the Norwoods over the son of Brenda by that former husband. The Norwoods, mother and son, now lived together in Clearwater, Florida. The defendant made a small down payment on the "fishing trip" by giving Gypsy $100.

When Gypsy got back home to Virginia he contacted FBI Agent Thomas L. Blades. Gypsy knew what to do as he had been making his living as a skip tracer working for a bail bondsman in tracking fugitives that failed to appear in court. He referred to himself as a bounty hunter. He also supplemented his income from time to time by serving as a paid informant for the FBI, which is what he had in mind this time. Gypsy related the story to Agent Blades. About the same time, the defendant called Gypsy to emphasize his seriousness about something being done to the Florida people. A few weeks later, at the request of Agent Blades, Gypsy called the defendant to see if he was still interested in the murder-for-hire proposition. He recorded the conversation. The defendant expressed his continuing interest. The plan agreed on was that Gypsy would arrange for a friend of his to go to Florida and take care of the fishing trip. The defendant agreed to have Gypsy's friend, the supposed hired killer, call him directly to discuss the proposed murder further, adding a preference to

eliminate both Norwoods with one trip. About a month later the defendant became impatient and called Gypsy to find out why Gypsy's friend had not contacted him as planned. Agent Blades, upon hearing this from Gypsy, called and talked to the defendant, identifying himself as the friend of Gypsy from whom the defendant was expecting to hear. The defendant again expressed his desire to have both Norwoods taken care of and said he would pay $500 up front for that service. They then made plans to meet at the Indianapolis airport. Agent Blades called the defendant again and negotiated a fee of $1,500 for both murders. The defendant "wanted it done and over." The plans for the contemplated airport meeting with Agent Blades, posing as the hired killer, were finalized. A last minute call from Agent Blades to the defendant, however, moved the meeting from the airport to a hotel adjacent to the airport.

At that hotel meeting the defendant explained to Agent Blades that the Norwoods kept taking him to court in a child-custody battle that was costing him a lot of money with nothing in return for him and his wife. He was determined, he said, that he and his wife regain custody of his stepson, Dustin. The defendant then paid Agent Blades $500 in cash, promising to pay another $1,000 to complete the murder assignment. He also showed Agent Blades photographs of the intended victims and gave him their Florida address. The defendant was emphatic about wanting the Norwoods out of his life and off the face of the earth. He envisioned the murders could be masqueraded as a drug deal. After supposedly finalizing the murder arrangements, Agent Blades suggested they go to the lobby for a drink, but that was interrupted by the defendant's arrest by FBI agents. The defendant admitted to the agents that he had Florida connections but claimed they had declined to kill the Norwoods.

At trial the defendant testified he never intended to have the Norwoods killed and attempted to shift the responsibility to Gypsy by saying that Gypsy threatened that if he did not proceed with the killings,

he and his family would be harmed instead. It was Agent Blades, the defendant also explained, who convinced him that the Norwoods should be killed. He conceded, however, that he did not offer those excuses at the time of arrest.

*Analysis*

The defendant raises four issues that need be addressed only briefly.

First, the defendant claims that his constitutional rights were violated when the court sua sponte permitted the admission into evidence of one of his own exhibits which defense counsel was trying to use to cross-examine Agent Blades. The exhibit was a memorandum of Agent Blades which generally set forth the contents of a taped conversation that Gypsy had with defendant's wife, Brenda. Defense counsel was having considerable difficulty in trying to use the memorandum for cross-examination purposes. He presented it to the witness and attempted to get selected portions of it into evidence. One defense question, for some reason, even inquired about a quotation in the memorandum that Brenda acknowledged continuing trouble with the people in Florida. Because of the difficulties defense counsel was having trying to use portions of the document, the court, on its own motion, admitted the exhibit and had it read to the jury.

The defendant now objects to the caption of the memorandum exhibit which identified the subject as "Mark Carr, Interstate Transportation in and of Racketeering, Murder for Hire." The defendant also objects to the hearsay aspects of the memo. Those portions had to do with the admission that the Carrs still had their Florida problems. As we read the record, defense counsel got that hearsay substantially into the record himself by his attempted cross-examination.

■ However, when the judge ruled he would admit the exhibit and have the witness read it to the jury, defense counsel failed to object. It is generally understood that counsel cannot remain silent, let the claimed error take place, and only object later. *Zayre Corp. v. S.M. & R. Co.*, 882 F.2d 1145, 1150 (7th Cir.1989) (citing Fed.

R.Evid. 103(a)(1)). There was time for defendant to speak up and object before the alleged harm was done, but he did not. When defense counsel finally objected after the exhibit had been read to the jury, he asked for a mistrial which was denied. The trial judge did indicate that he would not send that exhibit to the jury and asked defense counsel if he had any objection to his handling it that way. Defense counsel's response was "No, Your Honor. Thank you."

■ The lack of an objection may be excused in the case of plain error, *United States v. Calvo*, 865 F.2d 823, 827 (7th Cir.1988), *cert. denied*, 490 U.S. 1023, 109 S.Ct. 1750, 104 L.Ed.2d 187 (1989), but not in the circumstances of this case. Defense counsel ventured into the hearsay problem by his own use of the memo. The memo, however, did little or nothing to incriminate his client. Further, the word "Racketeering" was merely in the caption of the memo along with "Murder for Hire." "Murder for Hire" is what this case is about. The use of the word "Racketeering" was of no consequence. Reversal is not warranted for that reason or merely because some insubstantial hearsay may have gotten into the record. It was up to the defendant to show the error was not harmless. That could not and cannot be done, considering the evidence as a whole. The evidence was more than enough for conviction. *United States v. Heidecke*, 900 F.2d 1155, 1163 (7th Cir.1990).

The defendant relies on *United States v. Shoupe*, 548 F.2d 636 (6th Cir.1977). In that case it was held to be error when a witness's disavowed, unsworn statements were admitted in an attempt to refresh the recollection of the witness. That is what defense counsel contends he was trying to do here. In *Shoupe*, however, the court noted that those statements alone would have been sufficient to sustain a conviction. That strong a claim of error cannot be made in this case. Also, defense counsel in *Shoupe* specifically objected in advance to the use of the statements, in contrast to the present case. We find no clear abuse of discretion in the court's use of the exhib-

it to expedite the trial and to give the jury the benefit of the complete exhibit instead of limiting the jury to defense counsel's ineffective and confusing efforts to use bits of it here and there. *United States v. Foster*, 939 F.2d 445, 450 (7th Cir.1991).

■ Second, it is claimed that the trial court erred when it declined to permit the defendant to call a linguistic expert to analyze five tape-recorded conversations with the defendant. It was argued that the expert could help the jury better understand the evidence and determine factual issues. There is no quarrel with the expertise of the expert, only with the value of his expert testimony in this case. The defendant claims that the expert could have identified "a structure which consists of the reoccurring patterns in conversation that build the meaning and interpretation of the participants." Among other things, it is claimed the expert could recognize and interpret "structural clues, such as topic shifting pauses, intonation changes, and certain topic making expressions through the analysis of morphemes, semantic, syntax and discourses of which the lay person may not be aware." The expert also, it is claimed, could have demonstrated that "when a topic is continually regaled or reintroduced by the informant or agent that it may indicate dissatisfaction with the defendant's responses," suggesting some merit in defendant's defense of entrapment.

It did not appear to the trial judge that the jury needed that kind of help to understand an uncomplicated conversation in English. During an offer of proof the expert conceded he was confused by the relationship of the parties. The jury did not need that kind of help, and the trial judge properly so held. In these circumstances this evidence was not admissible under Fed.R.Evid. 702 or Fed.R.Evid. 1006. It is apparent that the expert's testimony would not assist the jury in understanding the evidence or help determine any facts, particularly when the defendant in his own testimony had the opportunity to try to explain away his own conversations. The

transcript of the recorded conversations was under eighty pages, not voluminous and not complicated. No outside help was needed. Because the trial court ruled properly excluding the expert's testimony it cannot be an abuse of discretion.

■ Third, the defendant claims further error in the government's refusal to produce Jencks Act [2] materials before and during the cross-examination of Agent Blades. The Jencks Act is intended to further the fair and just administration of criminal justice. *Campbell v. United States*, 365 U.S. 85, 81 S.Ct. 421, 5 L.Ed.2d 428 (1961). The defendant claims he was entitled to all reports prepared by Agent Blades about his contacts with Gypsy testified to during trial. The government agreed but responded that it had fulfilled its Jencks Act obligation by faxing all the reports to defense counsel prior to trial. Defense counsel disputed that he had received all the reports. The defense's argument finally narrows to one exhibit, the report of an in-person meeting between Agent Blades and Gypsy. One of the documents defendant received before trial, in any event, covered the contents of the other separate reports. Thus, the defendant has failed to show that there was anything in any of the reports he claims were missing which contradicted the testimony of Agent Blades or caused any other possible prejudice. At most what happened, if anything, was harmless error. *United States v. Welch*, 817 F.2d 273, 274 (5th Cir.), *cert. denied*, 484 U.S. 955, 108 S.Ct. 350, 98 L.Ed.2d 376 (1987).

■ The final, alleged error is that the trial judge should have reduced the defendant's sentence for acceptance of responsibility instead of enhancing his sentence for obstruction of justice. The defendant acknowledges that these findings are to be upheld unless clearly erroneous. *United States v. Franklin*, 902 F.2d 501, 505 (7th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 274, 112 L.Ed.2d 229 (1990).

U.S.S.G. § 3E1.1 provides that "[i]f the defendant clearly demonstrates a recognition and affirmative acceptance of personal

---

2. The Jencks Act is found at 18 U.S.C. § 3500 and Fed.R.Crim.P. 26.2.

responsibility for his criminal conduct," the sentencing court may reduce the offense level by two levels. The defendant claims he met that requirement by admitting his role in the offense, by expressing remorse for his conduct, and by blaming his conduct on substance abuse. What the defendant terms an "admission" was labelled by the district judge as merely lies and fabrications. The defendant's explanation that he was forced into the murder-for-hire scheme by Agent Blades, that Gypsy threatened the safety of defendant and his family, and that he did not intend to have the Norwoods killed appears to have been properly labelled by the trial judge. The defendant's explanations are as impossible for us to accept as they were for the trial judge. The defendant's trip to the Indianapolis hotel to meet with Agent Kerns, the payment of $500 on account with a promise of another $1,000, and his supplying pictures of the Norwoods and their addresses so the one-way "fishing trip" could be accomplished is enough to support the sentence determination.

Not only did the defendant fail to get the reduction he wanted, he got an enhancement for obstruction of justice instead. All accept that under the Guidelines testifying untruthfully concerning a material fact is sufficient basis for an offense-level increase, but under U.S.S.G. § 3C1.1 more is required than a mere conflict in the trial testimony or the jury's rejection of defendant's alibi or denial of guilt. *United States v. Contreras*, 937 F.2d 1191, 1194 (7th Cir.1991). There is, however, more evidence in this record than needed to dispose of the explanation the defendant advances and which the trial judge branded as lies and fabrications. The record is devoid of any acceptance of responsibility and fully supports the enhancement. *United States v. Lozoya–Morales*, 931 F.2d 1216, 1219 (7th Cir.1991).

Affirmed.