UNITED STATES of America,
Plaintiff–Appellee,

v.

Jerome SUSSKIND (91–1003); James
Rumler (91–1004); and Scott Nickerson
(91–1005), Defendants–Appellants.

Nos. 91–1003, 91–1004 and 91–1005.

United States Court of Appeals,
Sixth Circuit.

Argued June 16, 1993.

Decided Sept. 24, 1993.

Patricia G. Blake (argued), Gary Felder (briefed), Office of U.S. Atty., Detroit, MI, for plaintiff-appellee.

David I. Goldstein, Ann Arbor, MI (argued and briefed), for defendants-appellants.

Before: MERRITT, Chief Judge; and KEITH, KENNEDY, JONES, MILBURN, GUY, NELSON, RYAN, BOGGS, NORRIS, SUHRHEINRICH, SILER, and BATCHELDER, Circuit Judges.

DAVID A. NELSON, Circuit Judge.

These appeals were heard initially by a three-judge panel that vacated the defendants' criminal convictions and ordered a new trial on the basis of a perceived violation of the Jencks Act, 18 U.S.C. § 3500. See *United States v. Susskind*, 965 F.2d 80 (6th Cir.1992). The government petitioned for rehearing *en banc*, asking the full court to address the following issue:

> "Whether a district court's error in applying the Jencks Act justifies reversal of a criminal conviction without any analysis of the record to determine whether defendants were prejudiced?"

A majority of the court's active judges voted to grant the petition, and the panel decision was vacated by order reported at 975 F.2d 1206 (6th Cir.1992).

Upon rehearing the court has concluded that most, if not all, of the material sought by these defendants under the Jencks Act did not come within the purview of the statute. If any of the material in question was in fact subject to production under the act, moreover, a new trial would not be necessary if the error was harmless.

The judge who presided at trial is often in the best position to decide, in the first instance, whether a defendant has been prejudiced by any error that may have been committed under the Jencks Act. See *Lloyd v. United States*, 412 F.2d 1084, 1088 (5th Cir. 1969). Citing *Lloyd*, this court has suggested that the initial determination as to prejudice should ordinarily be made by the district court, subject to appellate review under a "clearly erroneous" standard. See *United States v. Chitwood*, 457 F.2d 676, 678–79 (6th Cir.), *cert. denied*, 409 U.S. 858, 93 S.Ct. 141, 34 L.Ed.2d 103 (1972). See also *United States v. Dye*, 508 F.2d 1226, 1235 (6th Cir. 1974), *cert. denied*, 420 U.S. 974, 95 S.Ct. 1395, 43 L.Ed.2d 653 (1975), where we upheld, as not clearly erroneous, a district court finding that the government's failure to produce Jencks Act statements had not prejudiced the defendants.

In the case at bar, as we shall explain presently, the district court may already have determined that any error committed under the Jencks Act was harmless. If the district court made such a determination, we cannot say that it was clearly erroneous. Absent such a determination, however—and assuming, again, that a violation of the Jencks Act occurred—*Chitwood* teaches that a remand would be appropriate unless the record makes it "perfectly clear" to us that the defense was not prejudiced. *Id.* at 678.

This case, like *Chitwood*, is one in which we think the record does make it perfectly clear that the defense was in no way prejudiced by any Jencks Act violation that may have occurred. Insofar as the Jencks Act issue is concerned, this court is prepared to affirm the convictions.

The court has also considered a claim by defendant Susskind that his Fourth Amendment rights were violated when he produced certain materials pursuant to a grand jury subpoena, issued without a showing of probable cause, commanding him to provide such materials "forthwith" to an agent of the grand jury. The three-judge panel that initially heard the case rejected this claim for reasons explained in Part IV of its opinion, 965 F.2d at 85–87. The court finds the panel's reasoning persuasive, and hereby adopts Part IV of the panel opinion.

The appellants raise a number of issues which, the court has decided, may appropriately be resolved by the original three-judge panel. That panel has reexamined each of

the remaining claims of error, and, as explained in an unpublished opinion filed contemporaneously with the publication of this decision, has determined that none of these claims requires reversal. The judgment entered by the district court will therefore be affirmed.

With that introduction, we turn to a statement of the case and a more detailed analysis of the Jencks Act issue.

I

The defendants were indicted by a federal grand jury in October of 1989 on charges that they had violated 18 U.S.C. §§ 1623, 1503, 1001 and the aider-and-abetter and conspiracy laws by conspiring to obstruct the administration of justice, making false declarations before a court, and using false documents. These charges stemmed from conduct in which the defendants were alleged to have engaged during the 1988 trial of a drug case against defendant James J. Rumler and others. Mr. Rumler stood accused of having conspired with a drug kingpin named Jesse Harget and a pilot named Robert Whiting to import over 15,000 pounds of marijuana into the United States from the Caribbean.

Mr. Rumler was represented in the drug case ("*Rumler I*") by Jerome Susskind, a criminal lawyer. Like Rumler himself, Mr. Susskind was later to become a defendant in "*Rumler II*," the obstruction of justice case now before us. The prosecutor who tried *Rumler I* was Assistant United States Attorney Stanley Janice.

One of the contentions outlined by prosecutor Janice during his opening statement to the jury in *Rumler I* was that Harget had given Rumler funds with which to purchase an airplane for use in importing marijuana from Jamaica. Mr. Susskind challenged this contention during his opening statement on behalf of Rumler. Susskind told the jury that the defense would show that the airplane was used for legitimate purposes and that the money for its purchase had been borrowed from an associate of Rumler's named Scott Nickerson. (Mr. Nickerson was likewise destined to become a defendant in *Rumler II*.)

On hearing Mr. Susskind's story as to how the airplane had been acquired, prosecutor Janice caused Mr. Nickerson to be served with a subpoena *duces tecum* covering, among other things, all documents pertaining to the alleged loan to Rumler. As the panel opinion explains in more detail (see 965 F.2d at 81–82), bogus documentation for such a transaction was then manufactured in Susskind's law office for use in court. Both Rumler and Nickerson testified that Nickerson had lent Rumler the money for the airplane, and they testified that the loan documents had been created contemporaneously with the events the documents purported to memorialize.

In an effort to establish the true provenance of the loan documents, Mr. Janice arranged to have a "forthwith" grand jury subpoena served on Mr. Susskind. Pursuant to the subpoena, and without any search of his office having been conducted, Mr. Susskind directed his secretary to turn over a typewriter, printwheel and correction ribbon. These items were subsequently linked to the falsified documents.

The *Rumler I* trial, which ran from November 28 through December 5, 1988, ended with a verdict of guilty on the marijuana importation charge. Mr. Rumler appealed his conviction to this court, and the conviction was affirmed in an unpublished opinion written by Chief Judge Merritt. *United States v. Rumler,* No. 89–1341, 1990 WL 9864, 1990 U.S.App. LEXIS 1965 (6th Cir. Feb. 8, 1990).

In August of 1989, while the conviction in *Rumler I* was pending on appeal but some two months before the *Rumler II* indictment, Mr. Rumler sent the Department of Justice a letter complaining of alleged misconduct on the part of prosecutor Janice and a customs official named Timothy Bethel. The essence of Rumler's complaint against Mr. Janice was that the latter "met with alleged cooperating witnesses to concoct and manufacture a criminal case against me, by fabricating evidence, both material and testimonial which alleges [sic] to involve me in a criminal conspiracy to smuggle marijuana into the continental United States." The letter (which made no reference to the fabrication of evidence by Rumler

and his lawyer) also complained that Mr. Janice

> "attempt[ed] to deceive and delude the [*Rumler I*] trial judge by interjecting his own opinions, thoughts, and feelings into judicially related hearings, meetings, and conferences. Mr. Janice further made factual misrepresentations and averments to the Court in an attempt to influence the outcome of criminal processes against me."

In due course the Department of Justice asked Mr. Janice to comment on Mr. Rumler's complaint. Janice responded with a six paragraph memorandum dated January 4, 1990. The *Rumler II* defendants subsequently sought production of the Janice memorandum under the Jencks Act.

Meanwhile, the grand jury went forward with its investigation into the suspected conspiracy among Rumler, Nickerson and Susskind to falsify documents and present perjured testimony at the *Rumler I* trial. Mr. Janice questioned several witnesses before the grand jury, after having given the grand jurors a brief overview of the investigation of the marijuana importation scheme. Counsel for the defendants in *Rumler II* were subsequently allowed to see a transcript of the overview,[1] but they were not given a transcript of the questions Mr. Janice posed to the grand jury witnesses.

The grand jury handed up its indictment of defendants Susskind, Rumler and Nickerson on October 19, 1989. The final page of the indictment bears the signature of Assistant United States Attorney Gary M. Felder, and it was Mr. Felder who tried *Rumler II* before the petit jury.

Mr. Janice was one of the people called as a government witness in *Rumler II.* Under questioning by Mr. Felder, Janice identified the indictment in *Rumler I;* described the roles of Susskind, Rumler and Nickerson in that case; summarized Mr. Rumler's testimony about the purchase of the airplane; explained how he (Janice) came to have Scott Nickerson served with a subpoena *duces tecum* for the alleged documentation on the financing of the airplane; described the documents produced by Mr. Nickerson pursuant to the subpoena; summarized testimony that Mr. Nickerson gave under questioning by Mr. Susskind; explained his reasons for suspecting that the documents furnished by Mr. Nickerson were not genuine, a suspicion that led to Janice's having the documents analyzed by a questioned document examiner from the Michigan State Police; testified that he had come to believe that the documents were in fact not authentic; and testified further that Mr. Rumler had ultimately been convicted, in *Rumler I*, of conspiracy to import marijuana. Mr. Janice gave no testimony at all regarding Mr. Rumler's subsequent complaint to the Department of Justice about the supposed prosecutorial misconduct.

Before cross-examining Mr. Janice, counsel for the defendants asked the trial court to order the government to produce (1) the memorandum in which Mr. Janice had responded to Mr. Rumler's complaint of prosecutorial misconduct and (2) all "statements" made by Mr. Janice before the grand jury in addition to the overview of the marijuana investigation. The government took the position that the requested materials did not come within the Jencks Act, but offered to submit everything to the court *in camera* so that the court could decide.[2] There has never been any suggestion that the government was guilty of bad faith in withholding the materials.

The trial judge said that she would read the grand jury transcript, whereupon counsel for Mr. Nickerson remarked that "[t]he

---

1. This fact was not made clear in the first round of briefs filed in the instant appeals, and the original panel was under the mistaken impression that the overview had been withheld from the defendants. See *Susskind*, 965 F.2d at 88 (Nelson, J., dissenting). The matter has been clarified on rehearing, and it is undisputed that the *Rumler II* defendants did see Mr. Janice's introductory statement to the grand jury. (The defendants did not use the statement in cross-examining Mr. Janice, incidentally.)

2. 18 U.S.C. § 3500(c) provides that "[i]f the United States claims that any statement ordered to be produced under this section contains matter which does not relate to the subject matter of the testimony of the witness, the court shall order the United States to deliver such statement for the inspection of the court in camera."

memorandum[ ] in response to the Rumler complaint is, frankly, what I'm more concerned about." Prosecutor Felder pointed out that he had not asked Mr. Janice anything about the Rumler complaint on direct examination, and Nickerson's counsel responded that the memorandum might contain inconsistent statements. The judge undertook to read both the memorandum and the grand jury transcript that evening, before the cross-examination of Mr. Janice began. The trial was then recessed until the following day.

The court heard further argument on the Jencks Act question in the morning, at which time defense counsel were given an opportunity "to state, specifically, why it is you're seeking this evidence at this time." Mr. Nickerson's lawyer responded that anything Mr. Janice had said before the grand jury "cover[ed] the same subject matter as this trial," while the memorandum prepared in response to Mr. Rumler's complaint likewise "relates to the very same subject matter that is at issue in this case. And as such, I think it's likely there may be inconsistencies."

After according defense counsel full opportunity to argue the issue, the trial judge declined to order production of either the memorandum or the transcript. Her review, she stated, showed "there are no inconsistencies" with Mr. Janice's trial testimony. She agreed that the materials could be placed in the record, under seal, so as to be available to the court of appeals if necessary.

The government presented numerous witnesses in addition to Mr. Janice. Among the government's witnesses was the questioned document examiner from the Michigan State Police, who testified that he had analyzed loan documents from *Rumler I* bearing the dates June 3, 1986; August 5, 1986; and December 5, 1986. He went on to give it as his opinion the documents had all been prepared at the same time and probably by the same person; that the December document had been signed after having been placed on top of the June and August documents; and that all three documents, which were very fresh looking, had been folded together at the same time.

A second expert witness testified that the typewriter and printwheel from Mr. Susskind's law office produced the same horizontal spacing, vertical spacing, line spacing and alignment as found on the purported loan documents. This witness testified further that the correction ribbon from Mr. Susskind's office had been used to correct all three documents. Based on his analysis of the ink from the ballpoint pen with which Mr. Rumler had signed the documents dated June and August of 1986, finally, the witness testified that the documents could not have been signed before 1987, because the ink was not manufactured until that year.

The jury found each of the three defendants in *Rumler II* guilty on each count with which he had been charged. The defendants perfected timely appeals, the subsequent history of which has been described above.

## II

### A

■ Contrary to the argument presented by defense counsel before the trial court, the statutory test for production of a witness statement under the Jencks Act is not whether the statement relates to the subject matter "at issue in [the] case." The test is whether the statement relates to the subject matter "as to which the witness has testified" on direct examination. The statute could hardly be plainer:

"After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter *as to which the witness has testified.* If the entire contents of any such statement relate to the subject matter of *the testimony of the witness,* the court shall order it to be delivered directly to the defendant for his examination and use." 18 U.S.C. § 3500(b) (emphasis supplied).

The trial judge correctly rejected defendant Nickerson's argument that anything relating to the subject matter of the trial would be Jencks Act material. The rejection of this

argument should have come as no surprise to Mr. Rumler, at least, for in the opinion affirming Rumler's conviction on the marijuana charge this court stated that "[t]he Jencks Act requires the government in criminal prosecutions to produce witness statements in its possession which relate to *the subject matter to which government witnesses have testified on direct examination.*" *Rumler,* No. 89–1341, 1990 WL 9864, at \*3 n. 3, 1990 U.S.App. LEXIS 1965, at \*7 n. 3 (emphasis supplied).

On his direct examination, as we have seen, Mr. Janice did not testify as to the complaint Mr. Rumler had lodged with the Department of Justice. The relationship between the subject matter as to which Mr. Janice did testify in *Rumler II* and the memorandum in which he had responded to the complaint of prosecutorial misconduct in *Rumler I* is, to say the least, tangential.

Like the district court, we have seen the full text of the Janice memorandum. The defendants have not seen it, and at the time of trial the defendants were not in a position to know for sure whether the memorandum did or did not relate to the subject matter of Mr. Janice's testimony. The defendants are in a better position to know this now, because they were furnished a fairly detailed summary of the memorandum's contents well before the rehearing of their appeals.[3] Yet in their supplemental briefs and oral argu-

ments on rehearing, the defendants failed to offer any explanation of how the Janice memorandum "relates to the subject matter as to which the witness has testified." This failure is significant, because, to repeat, the defendants were entitled to see the memorandum if and only if it related to the subject matter of the testimony given by Mr. Janice on direct examination.[4]

Although we are more than a little dubious about the proposition that Mr. Janice's refutation of the complaint of prosecutorial misconduct in the marijuana case is a statement that relates to the testimony given by Mr. Janice in the obstruction of justice case, our conclusion that any error in failing to order production of the memorandum was harmless makes it unnecessary to decide the "statement that relates" issue. We shall explain our resolution of the harmless error issue shortly, but first we need to say a few words about the grand jury transcript.

█ The transcript discloses that the words spoken by Mr. Janice before the grand jury fit within one or another of three categories. First there was the introductory description of the marijuana investigation. That statement, as we now know, was made available to counsel for the defendants prior to Mr. Janice's cross-examination. Next there were statements (advice to the grand jury witnesses on their legal rights, *e.g.*) that

---

3. The summary was contained in the separate opinion filed by this writer when the original panel decision was announced. After describing Mr. Rumler's complaint of prosecutorial misconduct, the opinion gave this description of the memorandum (or "letter") with which Mr. Janice responded to the complaint:

    "Mr. Janice's response starts out by describing the charges of prosecutorial misconduct, and it goes on to deny Rumler's charge that Janice conspired to manufacture evidence of marijuana importation. The letter explains that the marijuana case was developed primarily by another assistant United States Attorney—a fact brought out in the *Rumler II* trial and never challenged by the defendants—with Mr. Janice becoming involved only after the debriefing of key witnesses had been completed.

    "With reference to a charge by Rumler that Janice 'deceived and deluded' the trial judge in *Rumler I,* the letter makes the obvious point that the record of those judicial proceedings

speaks for itself. The letter also points out that Rumler made no such contention in his brief on appeal.

    "The letter then gives a short description of the indictment against the defendants in *Rumler II,* asserts that a person incarcerated with Rumler reported to federal agents that Rumler had told him he made his allegations in an effort to derail the investigation that led to the second indictment, and concludes with a flat denial that Rumler's charges are true." *United States v. Susskind,* 965 F.2d at 88–89 (Nelson, J., dissenting).

4. We do not mean to suggest that the defendants' appellate counsel had to explain *precisely* how the Janice memorandum relates to Janice's testimony. Given the indisputable fact that they had known for months what the substance of the Janice memorandum was, however, it is not too much to ask that counsel at least offer some general theory as to how the memorandum might have related to the testimony. Counsel offered no such theory.

clearly did not relate to the subject matter on which Mr. Janice testified in *Rumler II.* And finally there were questions put by Mr. Janice to witnesses.

Many of the questions did relate to the subject matter on which Janice subsequently testified. The trial court was not required to order that the questioning be turned over to the defendants under the Jencks Act, however, unless the questioning rose to the dignity of a "statement." We do not think it did.

Mr. Janice's questions, as we read them, were just that. They did not impart information, they asked for it. They were purely interrogatory in character, not declarative.

There may be rare occasions when a lawyer's question to a witness can constitute a "statement," but ordinarily a statement ends with a period, not a question mark. See, for example, Rule 801(a), Fed.R.Evid., defining a statement as an "assertion." Nothing in the transcript of the questions posed by Mr. Janice suggests to us that there is any reason, in this case, to give the statutory term a broader meaning than it would have in ordinary usage. The questions simply were not "statements" within the meaning of the Act.

**B**

Rule 52(a), Fed.R.Crim.P., which is captioned "Harmless Error," provides that "[a]ny error ... which does not affect substantial rights shall be disregarded." The Supreme Court has told us that "Rule 52 is, in every pertinent respect, as binding as any statute duly enacted by Congress, and federal courts have no more discretion to disregard the Rule's mandate than they do to disregard constitutional or statutory provisions." *Bank of Nova Scotia v. United States,* 487 U.S. 250, 255, 108 S.Ct. 2369, 2374, 101 L.Ed.2d 228 (1988).

Mistakes in the application of the Jencks Act are unquestionably subject to "harmless error" analysis, see *Rosenberg v. United States,* 360 U.S. 367, 370–71, 79 S.Ct. 1231, 1234, 3 L.Ed.2d 1304 (1959), although courts must not "speculate" on whether Jencks Act statements could have been used effectively at trial, see *Clancy v. United States,* 365 U.S. 312, 316, 81 S.Ct. 645, 648, 5 L.Ed.2d 574

(1961), and "the harmless-error doctrine must be strictly applied in Jencks Act cases." *Goldberg v. United States,* 425 U.S. 94, 111 n. 21, 96 S.Ct. 1338, 1348, 47 L.Ed.2d 603 (1976). Whether an error committed at trial is harmless depends on whether the error is one that might reasonably be thought to have had "substantial and injurious effect or influence in determining the jury verdict." *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946); *cf. United States v. Olano,* —— U.S. ——, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). The strength of the evidence of guilt can be an important factor in this calculus. See *United States v. Nathan,* 816 F.2d 230, 238 (6th Cir.1987); *United States v. Rippy,* 606 F.2d 1150, 1154 (D.C.Cir.1979). "Because the Jencks Act is not constitutionally required," finally, "a court need not find a Jencks Act error harmless beyond a reasonable doubt in order to uphold a conviction." *United States v. Lam Kwong–Wah,* 924 F.2d 298, 310 (D.C.Cir.1991) (citations omitted).

■ As indicated at the outset of this opinion, it is often the trial court that is in the best position to make the initial determination as to whether a Jencks Act error may have had a substantial and injurious influence on the trial. *Cf. Chitwood,* 457 F.2d at 678–79. In the case at bar the trial judge did not explicitly undertake a harmless error analysis, but after having read the Janice memorandum (and the grand jury transcript, for that matter) with Mr. Janice's testimony fresh in her mind, the judge did declare on the record that "[t]here are no inconsistencies."

■ This is not a reason for withholding a Jencks Act statement, of course, and the court's observation sounds very much like a finding that any error in not ordering the government to turn the statement over to the defendants would be harmless. Error under the Jencks Act is usually deemed harmless in the absence of any apparent inconsistencies between the statement and the testimony given by its author on direct examination. See *United States v. Welch,* 817 F.2d 273, 274 (5th Cir.), *cert. denied,* 484 U.S. 955, 108 S.Ct. 350, 98 L.Ed.2d 376 (1987); *United States v. Carr,* 965 F.2d 408, 412 (7th Cir.

1992). Even the existence of a few minor discrepancies is not necessarily enough to turn harmless error into reversible error. See *United States v. Sink*, 586 F.2d 1041, 1050–51 (5th Cir.1978), *cert. denied*, 443 U.S. 912, 99 S.Ct. 3102, 61 L.Ed.2d 876 (1979); *United States v. Sasser*, 971 F.2d 470, 481 (10th Cir.1992), *cert. denied*, — U.S. —, 113 S.Ct. 1292, 122 L.Ed.2d 683 (1993). Outright contradiction between a witness' testimony and his prior statement is not the only test of inconsistency, of course, because an omission or a shift in emphasis can also be pertinent in cross-examination. See *Jencks v. United States*, 353 U.S. 657, 667, 77 S.Ct. 1007, 1012, 1 L.Ed.2d 1103 (1957). This is not a significant consideration in the case at bar, however, because the subject matter covered by Mr. Janice in his memorandum to the Department of Justice is, at best, only barely related to the subject matter covered in his direct testimony at trial.

A finding that there are no inconsistencies in the instant case would certainly not be clearly erroneous. Notwithstanding the defendants' familiarity with the substance of the Janice statement (see n. 3, *supra*), they have been able to offer no explanation of how access to the Janice memorandum might have enabled them to impeach Mr. Janice or, indeed, do anything else likely to have had a substantial influence on the outcome of the trial. (We note, in this connection, that 18 U.S.C. § 3500(a) "manifests the general statutory aim to restrict the use of [Jencks Act] statements to impeachment." *Palermo v. United States*, 360 U.S. 343, 349, 79 S.Ct. 1217, 1223, 3 L.Ed.2d 1287 (1959).)

Absent some indication of prejudice, we would have no basis for reversing a finding of harmless error. See *United States v. Boshell*, 952 F.2d 1101, 1105 (9th Cir.1991) ("Without any suggestion that the notes would have helped appellant overcome the hard evidence the district court used to convict him, we cannot reverse"). *Cf. United States v. Sperling*, 726 F.2d 69, 72 (2d Cir.) (reversal inappropriate where "there is no reasonable likelihood that the timely production of the tape would have affected the verdict"), *cert. denied*, 467 U.S. 1243, 104 S.Ct. 3516, 82 L.Ed.2d 824 (1984); *United States v. Hill*, 976 F.2d 132, 141 (3rd Cir. 1992) (where defendant offered no specific example of how he was prejudiced, finding of harmless error not erroneous); *Lam Kwong-Wah*, 924 F.2d at 310 (no error in finding by trial judge that Jencks Act material was "insignificant" to the defendant's defense and "would not have benefited him").

Mr. Rumler's supplemental brief contains an indirect suggestion that the case should be remanded with instructions that Mr. Janice's testimony be stricken under 18 U.S.C. § 3500(d).[5] The suggestion is not well taken. Section 3500(d) applies only where the government elects not to comply with an order to produce a Jencks Act statement, and the government made no such election here. To follow Mr. Rumler's suggestion, moreover, would be to violate the command of Rule 52(a) that harmless error be "disregarded."

[redacted] Even if the trial judge's finding of no inconsistencies is not tantamount to a finding of no harmful error in this case, we consider it "perfectly clear," to use *Chitwood*'s phrase, that the error, if any, was in fact harmless. The government's case against these defendants was a very strong one, and it is simply not reasonable to suppose that disclosure of whatever part of the Janice memorandum might be thought to have come within the Jencks Act could have had any substantial influence on the outcome of the trial.

There is only one paragraph of the Janice memorandum that can fairly be said to relate to the subject matter of *Rumler II*, whether or not it relates to the subject matter of the testimony given by Mr. Janice. That paragraph reads, in its entirety, as follows:

> "Rumler, his attorney (Jerome Susskind), and an additional individual (Scott Nickerson) have been charged in a multicount indictment in this district with vari-

5. Section 3500(d) reads as follows:

"If the United States elects not to comply with an order of the court under subsection (b) or (c) hereof to deliver to the defendant any such statement, or such portion thereof as the court may direct, the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared."

ous charges relating to perjury and obstruction of justice. The charges originate from the conduct of the above-named persons during the trial of *United States v. Rumler, et al.*, 87–80933. The indictment alleges that these persons presented false documents at trial in an effort to win an acquittal. Attorney Susskind has also been charged with filing a false, post-conviction motion. The charge relates to filing an affidavit with the court which he knew to be false." [6]

This paragraph (the substance of which had long since been disclosed, of course) was read to defense counsel from the bench, during the reargument of the appeals, so that counsel would have an opportunity to tell us then how the withholding of the quoted material might have prejudiced the defense. No such explanation was forthcoming. Even under the strictest application of the harmless error doctrine, it seems to us, any error in not ordering disclosure at the time of trial was patently harmless.

**AFFIRMED.**

MERRITT, Chief Judge, dissenting.

Both the memorandum written to the Justice Department by prosecutor Stanley Janice and the transcripts of the grand jury proceedings at which Mr. Janice questioned

witnesses were Jencks Act material that the government should have produced. This Court should unseal this material, provide it to the defendants, and remand this case to the district court for a determination of whether this obvious violation of the Jencks Act was harmless error.

**I**

Stanley Janice's testimony on direct examination at the *Rumler II* trial was extensive. He testified generally about the facts underlying the *Rumler I* case, and more specifically about his involvement in the indictment and trial of defendant Rumler, including the discovery process in that trial and his dealings with defendants Susskind and Nickerson during the course of the trial. Mr. Janice testified that Brian Legghio was the Assistant United States Attorney in charge of the case. Stanley Janice also testified on direct examination concerning his receipt from Nickerson of the three documents which are alleged to have been fraudulent. He explained that he was suspicious of whether these documents were what they purported to be and described his motivation for consulting a Michigan State Police document examiner to determine if the documents were genuine.

---

**6.** It is true, as Chief Judge Merritt notes in his dissent, that the Janice memorandum also contained a passage explaining that an Assistant U.S. Attorney named Brian Legghio had originally been in charge of the *Rumler I* investigation. It is also true that during his direct examination at trial, Mr. Janice mentioned in passing that Mr. Legghio had been the attorney in charge of the *Rumler I* case at a time when the prosecution asked Mr. Susskind, in his capacity as attorney for Mr. Rumler, to provide reciprocal discovery. The identification of Mr. Legghio served to let the members of the jury know why the letter requesting reciprocal discovery had been signed by someone whose name would otherwise have meant nothing to them.

The sentence (and it was just one sentence) in which Mr. Janice told the jury who Mr. Legghio was had about as much potential for impeachment as did the first sentence in the testimony of this witness: "My name is Stanley John Janice." Mr. Janice also told the grand jury what his name was, but this hardly means that the defendants were prejudiced by not having seen the full grand jury transcript.

Judge Merritt suggests that the defendants' right to due process of law is violated by allow-

ing the district judge to say, in effect, "I do not believe that the requested materials come within the Jencks Act, but if I am wrong in this I think my error is harmless." If this case were to be remanded to the district court for a fresh determination as to whether the alleged Jencks Act violation was harmless, however, the judge making the new determination would be the same judge who has already indicated rather clearly, after she had an entire evening in which to reflect on the matter, that she could see no prejudice.

Recognizing that no useful purpose would be served by remanding this case for a harmless error determination that could not possibly be overturned on appeal, the original panel took the bull by the horns and ordered a new trial. This is the only logical course to follow if one believes that it can *never* be "perfectly clear" that the defense has not been prejudiced by a Jencks Act violation. The case law teaches that there is such a thing as harmless error, however, and that lack of prejudice is sometimes obvious. If there has ever been a case in which the absence of prejudice is crystal clear, this is that case.

The Jencks Act, 18 U.S.C. § 3500, codified the holding in *Jencks v. United States,* 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957), which established a defendant's right to inspect documents in the government's possession "touching the subject matter of [government witnesses'] testimony at the trial." *Id.* at 672, 77 S.Ct. at 1015; *See also, Goldberg v. United States,* 425 U.S. 94, 104, 96 S.Ct. 1338, 1345, 47 L.Ed.2d 603 (1976) (discussing legislative history of Jencks Act); *Clancy v. United States,* 365 U.S. 312, 315, 81 S.Ct. 645, 647, 5 L.Ed.2d 574 (1961) (citing legislative history). *Jencks* recognized that "only the defense is adequately equipped to determine the effective use for purposes of discrediting the Government's witness and thereby furthering the accused's defense," 353 U.S. at 668–69, 77 S.Ct. at 1013, and that "the interest of the United States in a criminal prosecution '... is not that it shall win a case, but that justice shall be done....'" *Id.* at 668, 77 S.Ct. at 1013 (quoting *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935), *overruled by Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960)).

In enacting the Jencks Act, Congress was attempting to prevent what it perceived as a "misapplication of *Jencks*" that would lead to "fishing expeditions" through government files containing confidential information and matters of "public interest, safety, welfare, and national security." *Goldberg,* 425 U.S. at 104, 96 S.Ct. at 1345 (citing H.R.Rep. No. 700, 85th Cong., 1st Sess., 4 (1957)). "The Act was not intended to limit the *Jencks* decision," however, with regard to its protection of the accused's right to a fair trial. *Id.* The Act reflects the realization that "disclosure, rather than suppression, of relevant materials ordinarily promotes the proper administration of criminal justice." *Dennis v. United States,* 384 U.S. 855, 870, 86 S.Ct. 1840, 1849, 16 L.Ed.2d 973 (1966).

The wording of the Jencks Act is abundantly clear about what is required for material to fall under its purview. First, the material must be a "statement," as defined by the Act. 18 U.S.C. § 3500(b). Second, the material must "relate to the subject matter as to which the witness has testified" at trial. *Id.* Both of the items the district court withheld from the defendants were obvious Jencks Act material.

The January 3, 1990 memorandum Stanley Janice wrote to the Justice Department in response to defendant Rumler's complaint against him is clearly a "written statement made by [Mr. Janice] and signed or otherwise adopted or approved by him." 18 U.S.C. § 3500(e)(1). It "relates to the subject matter" as to which Janice testified at trial, 18 U.S.C. § 3500(b), because it discusses the *Rumler I* case, which Janice testified about, and contains the following statement concerning the extent of Janice's involvement in that case:

> During the total period prior to indictment, the investigation was directed by AUSA Brian Legghio. I became involved only after a substantial portion of the investigation, including debriefing of key witnesses, had been completed. AUSA Legghio continued to be the lead government attorney until he left the office some months after the return of the indictment by the grand jury.

This statement is directly related to Janice's testimony at trial that Legghio was in charge of the case, and raises questions about the timing and extent of Janice's involvement and the circumstances under which Legghio left the office. The rest of the memorandum is generally related to most of Janice's other trial testimony concerning *Rumler I.*

The grand jury transcripts that the district court withheld contain Janice's statements and questions on December 6th and 8th, 1988 in his quest for the forthwith subpoena that was served on defendant Susskind at his office. They also contain statements made after the subpoena was served when the prosecutors presented the testimony of secretaries who worked in Susskind's office. The transcripts clearly relate directly to Janice's testimony on direct examination about his suspicion that the documents given to him by Nickerson were fraudulent, and they relate generally to his testimony about the conduct of the *Rumler I* case.

The grand jury transcript is a "statement" because it is a "transcription ... which is a substantially verbatim recital of an oral

statement made by [Mr. Janice] and recorded contemporaneously with the making of such oral statement." 18 U.S.C. § 3500(e)(2). The Jencks Act contains nothing that would exclude "questions" from the scope of "statements." One need only review the exchange at the *en banc* hearing of this case to know that many "questions" posed by lawyers, and judges, while phrased in the form of questions are statements.[1]

It is naive to think, as the Court seems to suggest, that only rhetorical questions "impart information." The fact that an appellate judge reviewing a transcript cannot detect "statements" contained within "questions" does not mean that defense lawyers could not find statements contained in what appear to be questions. The subject matter of questions, their wording, order and scope, particularly in the context of an informal grand jury proceeding, normally suggest assumptions, biases, or other fodder for impeachment on cross-examination. *C.f. Alderman v. United States*, 394 U.S. 165, 182, 89 S.Ct. 961, 971, 22 L.Ed.2d 176 (1969) ("An apparently innocent phrase, a chance remark, a reference to what appears to be a neutral person or event ... may have special significance to one who knows the more intimate facts of an accused's life. And yet that information may be wholly colorless and devoid of meaning to one less well acquainted with all relevant circumstances").

There is no indication that the Jencks Act should be interpreted as narrowly as the Court today interprets it. The underlying goal of the Act is to protect a defendant's right to a fair trial by preventing the government from hiding information that could be helpful to his defense. This goal, combined with the fact that defense attorneys are best qualified to determine what information is useful to their case, suggests a broad reading of the terms "relates to the subject matter" and "statement" in § 3500(b). Without reading the statute broadly at all, however, the material in this case clearly is Jencks material that should have been produced. The Court's suggestion that "most, if not all, of the material sought by these defendants under the Jencks Act did not come within the

purview of the statute" is ingenuous because by construing the Act as narrowly as it does, the Court ensures that very little material sought by *any* defendant will come within the purview of the statute. There is absolutely no danger in this case of the "fishing expedition" through the government's files that prompted Congress to enact this legislation. There is no reason the district court should not have provided the sealed materials to the defendants.

On a motion for production of Jencks material, the Act limits the district court's review to consideration of whether the materials in question are statements that relate to the subject matter of the government witness' testimony. 18 U.S.C. § 3500(b). Thus the *only* appropriate rulings after *in camera* review under the Jencks Act are: 1) that some or all of the material does not contain statements that relate to the subject matter of the witness' testimony and therefore does not have to be produced, or 2) that the material does contain statements that relate to the subject matter of the witness' testimony and must be produced. The Act commands that after excising any portions that do not relate to the witness' testimony, "the court *shall* then direct delivery of such statement to the defendant for his use." 18 U.S.C. § 3500(c) (emphasis added). The Act provides no discretion for the court to delve into how the defendant might use the material. The district court's finding that there were "no inconsistencies" was clear error.

## II

Having determined that the documents in question indeed were Jencks Act material and should have been produced, I now turn to a discussion of whether and under what circumstances such an error may be deemed "harmless." In *Rosenberg v. United States*, 360 U.S. 367, 79 S.Ct. 1231, 3 L.Ed.2d 1304 (1959), the Supreme Court held that "there is such a thing as harmless error" in Jencks Act cases. *Id.* at 371, 79 S.Ct. at 1234. The Court reached this conclusion, however, in a case where "the very same information was possessed by defendant's counsel as would

---

1. E.g., My "question" is: How can the Court be

so wrong in this case?

have been available were error not committed." *Id.* The Jencks material in question was a typewritten copy of a handwritten statement that the defendant already had and a statement in a letter that had already been revealed to the defense by the government witness' testimony at the trial. *Id.* at 370, 79 S.Ct. at 1234. The Court warned that "[a]n appellate court should not confidently guess what a defendant's attorney might have found useful for impeachment purposes in withheld documents to which the defense is entitled." *Id.* at 371, 79 S.Ct. at 1234.

Every one of the Supreme Court cases interpreting and applying the *Rosenberg* harmless error rule has applied that standard very narrowly if at all. *See Clancy v. United States,* 365 U.S. 312, 316, 81 S.Ct. 645, 648, 5 L.Ed.2d 574 (1961) (refusing to consider a Jencks Act error harmless, limiting *Rosenberg* to its facts, and holding that "[s]ince the production of at least some of the statements withheld was a right of the defense, it is not for us to speculate whether they could have been utilized effectively"); *Killian v. United States,* 368 U.S. 231, 244, 82 S.Ct. 302, 309, 7 L.Ed.2d 256 (1961), (instructing that a Jencks error should be deemed harmless, and the defendant's conviction reinstated, only if the district court found on remand that the defendant already possessed the information contained in the improperly withheld Jencks material). *See also, Goldberg,* 425 U.S. at 111 n. 21, 96 S.Ct. at 1348 n. 21 (noting that courts cannot speculate whether Jencks material could have been used effectively at trial so "the harmless-error doctrine must be strictly applied in Jencks Act cases" (quoting *Clancy,* 365 U.S. at 316, 81 S.Ct. at 648)); *Erckman v. United States,* 416 U.S. 909, 913, 94 S.Ct. 1618, 1620, 40 L.Ed.2d 115 (1974) (Marshall, J., dissenting from Order denying certiorari) ("we have held that the harmless-error doctrine should be employed with restraint in Jencks Act cases").

This Court's cases interpreting *Rosenberg* do nothing to expand the narrow application of the harmless error rule. *See United States v. Pope,* 574 F.2d 320, 326–27 (6th Cir.), *cert. denied,* 436 U.S. 929, 98 S.Ct. 2828, 56 L.Ed.2d 774, 436 U.S. 949, 98 S.Ct. 2856, 56 L.Ed.2d 792, 439 U.S. 868, 99 S.Ct. 195, 58 L.Ed.2d 179 (1978) (holding an unintentional Jencks error harmless when the trial court had provided the statements to the defendant and recalled the witnesses to cure the error); *United States v. Lane,* 479 F.2d 1134, 1136 (6th Cir.), *cert. denied,* 414 U.S. 861, 94 S.Ct. 78, 38 L.Ed.2d 112 (1973) (holding there was no Jencks error due to the government's failure to turn over rough notes used to make a report when the report itself had already been given to the defense); *United States v. Fruchtman,* 421 F.2d 1019, 1022 (6th Cir.), *cert. denied,* 400 U.S. 849, 91 S.Ct. 39, 27 L.Ed.2d 86 (1970) (same); *United States v. Lonardo,* 350 F.2d 523, 528 (6th Cir.1965) (ordering a mistrial because an interview report given to the defense did not contain the same information as a transcription of the interview that the government destroyed just before the trial). Many of the Jencks Act cases in this Circuit that have held an error harmless have done so in situations where the government's withholding of statements was unintentional and the district court thus was not a party to the error as it was here. *See, e.g., Pope,* 574 F.2d 320; *United States v. Dye,* 508 F.2d 1226 (6th Cir.1974), *cert. denied,* 420 U.S. 974, 95 S.Ct. 1395, 43 L.Ed.2d 653 (1975). Thus, in light of our inability to determine how defense counsel might have used improperly withheld Jencks material, we have been loathe to say that Jencks errors are harmless except in the most obvious of cases.

This is not such an obvious case, and the Court's eagerness to clear this case from its dockets has led it to ignore the strict application it must give to the harmless error doctrine. The Court's main error is to equate the trial judge's baffling assertion that "[t]here are no inconsistencies" with a finding of harmless error. In saying that it found "no inconsistencies" the district court is simply saying that it cannot see how defense counsel could use the information to impeach witnesses. By conveniently reading this statement as a ruling on harmless error, the Court allows the district court to simultaneously commit an egregious Jencks Act error and declare that error harmless. This is a misreading of the Jencks Act, and it vio-

lates the defendants' right to due process of law. Harmless error analysis requires enough detachment from an alleged error to make an objective evaluation of the effect of that error. At the very least, harmless error analysis requires some *review* of an alleged error. It is impossible for a trial judge to commit a Jencks Act error and review it in one breath.

This Court's decision not only allows the district court to violate the Jencks Act, "confidently guess what defendant's attorney might have found useful for impeachment purposes," *Rosenberg,* 360 U.S. at 371, 79 S.Ct. at 1234, and deny defendants' due process rights by foreclosing their opportunity to even consider the impeachment value of the Jencks materials, but it compounds the error with circular logic that enables it to deprive the defendants of any meaningful appellate review of the error committed by the district court. The Court's argument goes like this: Since the defendants have not explained what in the withheld materials they would use to impeach the government witnesses, they have not shown that any error in keeping these materials from them was harmful. This is a hard argument to make with a straight face. The fact is that the defendants, even to this point, *have never been allowed to see the memorandum or the grand jury transcript.* The Court's suggestion that defendants' appellate counsel must be able to explain precisely how the memorandum relates to Janice's testimony, based only on the Court's reading of part of the memorandum at the *en banc* hearing is too much. The Jencks Act requires courts to provide such material to defendants at their trial, not to make them guess at how they would have used it some three years later.

The Court's holding allows courts rather than defense lawyers to craft an accused's defense. Fundamental notions of due process suggest that it can *never* be "perfectly clear" that the defense was not prejudiced by a Jencks Act error when the defense is not even allowed the chance to present an argument on the issue. It is equally clear that an accused's Sixth Amendment right to select his own counsel envisions that he will choose a lawyer whom he is confident can marshall

creative defenses and discover grounds for impeachment of prosecution witnesses in the most innocuous of material. By prohibiting the defendants from ever even seeing material that they are clearly entitled to under the law, this Court has stretched the Jencks Act and the *Rosenberg* harmless error standard beyond recognition.

We should unseal both the memorandum and the grand jury transcript and provide them to the defendants. We should then remand this case to the district court to review the Jencks Act violation under a very strict reading of the *Rosenberg* harmless error doctrine.